**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARTIN MARCEAU; CANDICE
LAMOTT; JULIE RATTLER; JOSEPH
RATTLER, JR.; JOHN G. EDWARDS;
MARY J. GRANT; GRAY GRANT;
DEANA MOUNTAIN CHIEF, on behalf
of themselves and others similarly
situated,
        *Plaintiffs-Appellants,*

        v.

BLACKFEET HOUSING AUTHORITY,
and its board members; SANDRA
CALFBOSSRIBS; NEVA RUNNING
WOLF; KELLY EDWARDS; URSULA
SPOTTED BEAR; MELVIN MARTINEZ,
Secretary; DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT,
United States of America,
        *Defendants-Appellees.*

No. 04-35210

D.C. No.
CV-02-00073-SEH

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Montana
Sam E. Haddon, District Judge, Presiding

Argued and Submitted on Rehearing
May 9, 2007—Portland, Oregon

Filed July 21, 2006
Amended March 19, 2008

Before: Harry Pregerson, Susan P. Graber, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge Graber;
Dissent by Judge Pregerson

## COUNSEL

Thomas E. Towe, Towe, Ball, Enright, Mackey & Sommerfeld, PLLP, Billings, Montana; Jeffrey A. Simkovic, Simkovic Law Firm, Billings, Montana; Mary Ann Sutton, Attorney at Law, Missoula, Montana, for the plaintiffs-appellants.

Stephen A. Doherty and Patrick L. Smith, Smith, Doherty & Belcourt, P.C., Great Falls, Montana; Timothy J. Cavan, Assistant U.S. Attorney, Billings, Montana, for the defendants-appellees.

John T. Harrison, Confederated Salish and Kootenai Tribes, Tribal Legal Department, Pablo, Montana; Patterson V. Joe, Patterson V. Joe, P.C., Flagstaff, Arizona, for the amici.

## ORDER

The opinion filed on July 21, 2006, slip op. 8071, and appearing at 455 F.3d 974 (9th Cir. 2006), is replaced in part and adopted in part by the amended opinion filed concurrently with this order. Further petitions for rehearing and petitions for rehearing en banc may be filed.

**OPINION**

GRABER, Circuit Judge:

Plaintiffs are members of the Blackfeet Indian Tribe who bought or leased houses built under the auspices of the United States Department of Housing and Urban Development ("HUD"). The houses had wooden foundations. The wood had been pressure-treated with toxic chemicals. Plaintiffs allege that the use of wooden foundations caused their houses to deteriorate and that the chemicals in the wood have caused, and continue to cause, health problems for those who live in the houses. On behalf of a class of persons similarly situated, Plaintiffs sued HUD, the Secretary of HUD, the Blackfeet Tribal Housing Authority and its board members ("the Housing Authority") under several theories. The district court dismissed the entire complaint under Federal Rule of Civil Procedure 12(b)(6).

On rehearing, we hold: (1) the Housing Authority forfeited its claim to tribal exhaustion and, in any event, waived its tribal immunity; (2) the government did not undertake a trust responsibility toward Plaintiffs to construct houses or maintain or repair houses; and (3) Plaintiffs alleged sufficient facts to state claims against HUD under the Administrative Procedure Act ("APA"). We readopt our earlier opinion[1] with respect to Plaintiff's breach of contract claims. Accordingly, we affirm the district court's dismissal of the case except as to Plaintiffs' claims against the Housing Authority and its board members and Plaintiffs' claims under the APA. As to those claims, we reverse and remand for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

Because the district court dismissed the amended complaint for failure to state a claim, we construe the facts from Plain-

---

[1]*Marceau v. Blackfeet Hous. Auth.*, 455 F.3d 974 (9th Cir. 2006).

tiffs' amended complaint, which we must deem to be true, in the light most favorable to them. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). But we "need not assume the truth of legal conclusions cast in the form of factual allegations." *United States ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986).

The Blackfeet Tribe is a federally recognized Indian tribe. In January 1977, the Tribe established a separate entity, the Blackfeet Housing Authority. *See* 24 C.F.R. § 805.109(c) (1977) (requiring, as a prerequisite to receiving a block grant from HUD, that a tribe form a HUD-approved tribal housing authority). The Blackfeet Tribe adopted HUD's model enabling ordinance. Blackfeet Tribal Ordinance No. 7, art. II, §§ 1-2 (Jan. 4, 1977), *reprinted in* 24 C.F.R. § 805, subpt. A, app. I (1977). Thereafter, HUD granted the Blackfeet Housing Authority authorization and funding to build 153 houses.

Construction of those houses, and some additional ones, began after the Housing Authority came into being in 1977. Construction was completed by 1980.[2] The houses—at least in retrospect—were not well constructed. They had wooden foundations, and the wood products used in the foundations were pressure-treated with toxic chemicals. The crux of Plaintiffs' complaint is that HUD directed the use of pressure-treated wooden foundations, over the objection of tribal members, and that the Housing Authority acceded to that directive.

In the ensuing years, the foundations became vulnerable to the accumulation of moisture, including both groundwater and septic flooding, and to structural instability. Some of the houses have become uninhabitable due to contamination from toxic mold and dried sewage residues. The residents of the houses have experienced health problems, including frequent

---

[2]In the district court, Plaintiffs' counsel stated that most of the houses were completed in 1978 and 1979, with "some follow-up into 1980."

nosebleeds, hoarseness, headaches, malaise, asthma, kidney failure, and cancer.

Plaintiffs bought or leased the houses, either directly or indirectly, from the Housing Authority. After it became clear that the houses were unsafe or uninhabitable, Plaintiffs asked the Housing Authority and HUD to repair the existing houses, provide them with new houses, or pay them enough money to repair the houses or acquire substitute housing. When they received no help from either entity, Plaintiffs filed this class action against the Housing Authority, HUD, and the Secretary of HUD. Plaintiffs seek declaratory and injunctive relief and damages for alleged violations of statutory, contractual, and fiduciary duties.

HUD filed a motion to dismiss for lack of subject matter jurisdiction and a motion to dismiss for failure to state a claim upon which relief can be granted. The Housing Authority and its board members filed a motion to dismiss because of tribal immunity. The district court granted those motions. In an earlier opinion, we affirmed the dismissal of HUD and its Secretary, but reversed with respect to the Housing Authority. *Marceau v. Blackfeet Hous. Auth.*, 455 F.3d 974 (9th Cir. 2006). The Housing Authority filed a petition for rehearing. The panel granted the petition and reheard the case. All parties, as well as amici curiae, participated in the rehearing. We now issue this revised opinion.

## STANDARD OF REVIEW

We review de novo each of the issues in this case. *See Coyle v. P.T. Garuda Indon.*, 363 F.3d 979, 984 n.7 (9th Cir. 2004) (concerning federal subject matter jurisdiction); *Demontiney v. United States*, 255 F.3d 801, 805 (9th Cir. 2001) (concerning an Indian tribe's sovereign immunity and the waiver thereof, waiver of the United States' sovereign immunity, and dismissal for failure to state a claim under Rule 12(b)(6)).

## DISCUSSION

### A.   *Tribal Immunity*

**[1]** Indian tribes generally enjoy immunity from suit. *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998) (noting that "an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity"). In our earlier opinion, we held that the Blackfeet Tribe waived tribal immunity through the enabling ordinance that established the Housing Authority.[3] *Marceau*, 455 F.3d at 978 83. On rehearing, the Housing Authority urges us to dismiss the claims against it, or at least to abstain from considering those claims until tribal courts rule on the question whether the Housing Authority is immune from suit. For two reasons, we are not persuaded that we should do either.

**[2]** We begin by recognizing that principles of comity generally require federal courts to dismiss, or abstain from deciding, cases in which a party asserts that an Indian tribal court possesses concurrent jurisdiction. *Crawford v. Genuine Parts Co.*, 947 F.2d 1405, 1407 (9th Cir. 1991); *see also Wellman v. Chevron U.S.A., Inc.*, 815 F.2d 577, 578 (9th Cir. 1987) ("Considerations of comity require the exhaustion of tribal remedies before the [tribal court's jurisdiction] may be addressed by the district court."). Ordinarily, exhaustion of tribal remedies is mandatory. *Burlington N. R.R. Co. v. Crow Tribal Council*, 940 F.2d 1239, 1245 (9th Cir. 1991).

---

[3]Blackfeet Tribal Ordinance No. 7, art. V, § 2 (Jan. 4, 1977), states:

> The [Blackfeet Tribal] Council hereby gives its irrevocable consent to allowing the [Housing] Authority to *sue and be sued* in its corporate name, upon any contract, claim or obligation arising out of its activities under this ordinance and hereby authorizes the Authority to agree by contract to waive any immunity from suit which it might otherwise have; but the Tribe shall not be liable for the debts or obligations of the Authority.

(Emphasis added.)

**[3]** But the Supreme Court has stated that the tribal exhaustion rule is "prudential" rather than "jurisdictional." *Strate v. A-1 Contractors*, 520 U.S. 438, 451 (1997). Because it is a non-jurisdictional principle, the preference for tribal exhaustion may be forfeited. The Housing Authority forfeited the argument that the tribal court should decide the immunity issue by failing to raise it until the Housing Authority's petition for rehearing. *Talk of the Town v. Dep't of Fin. & Bus. Servs.*, 353 F.3d 650, 650 (9th Cir. 2003). That being so, we readopt our earlier opinion on this issue, *Marceau*, 455 F.3d at 978-83.

Moreover, in this case, the tribal court already has ruled on the question. In *DeRoche v. Blackfeet Indian Housing Authority*, 17 Indian L. Rptr. 6036 (Blackfeet Trib. Ct. App. 1989), the Blackfeet Tribal Court of Appeals considered a breach of contract claim against the Housing Authority. That court adopted the Eighth Circuit's approach to interpreting a "sue and be sued" clause. *Id.* at 6042 (citing *Namekagon Dev. Co. v. Bois Forte Reservation Hous. Auth.*, 517 F.2d 508, 510 (8th Cir. 1975). The Blackfeet Tribal Court of Appeals held that the original Housing Authority enabling ordinance "is an indisputable qualified waiver of immunity by the Blackfeet Tribe and housing authority for a breach of contract action" and that, by adopting the clause," the tribe waived, to some extent, the housing authority's immunity from suit." *Id.* The court thus allowed the contract claim to proceed. *Id. DeRoche* is the only Blackfeet appellate decision, and it is on point. Even if exhaustion in tribal court were warranted, abstention would not be required. *DeRoche* is binding tribal precedent, and we would defer to the tribal court's extant interpretation. *See Hinshaw v. Mahler*, 42 F.3d 1178, 1180 (9th Cir. 1994) ("The Tribal Court's interpretation of tribal law is binding on this court.").[4]

---

[4]The Housing Authority points to *Whiteman v. Blackfeet Indian Housing Authority*, No. 97 CA 474 (Blackfeet Tribal Ct. Aug. 25, 1999), for the

**[4]** Thus, the tribal appellate court and this court agree that the Tribe waived the Housing Authority's tribal immunity. Whether the Housing Authority forfeited the issue of deference to the tribal court, or whether exhaustion applies, the result is the same.

## B.   *Claim of Federal Trust Responsibility*

Plaintiffs allege that HUD violated its trust responsibility to them, as tribal members, "because of [HUD's] comprehensive and pervasive control of the monies, the property, the standards for constructing the homes, the standards for providing mortgages for the homes, [and] the standards for who qualifies to live in the homes." Plaintiffs further allege that "[t]he corpus of the trust agreement is found in the statutes" concerning Indian housing. Before examining those statutes, we will set out some governing principles for interpreting them.

### 1.   *Governing Principles*

In general, a trust relationship exists between the United States and Indian Nations. *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17 (1831). But that relationship does not always translate into a cause of action.[5] In a pair of cases from

---

proposition that a tribal court has held that the ordinance in question did not waive tribal immunity. *Whiteman* is a decision of a Blackfeet trial court, while *DeRoche* is a published opinion of the Blackfeet Tribal Court of Appeals. *Whiteman* can take away nothing from *DeRoche*, any more than a district court's later ruling can detract from an earlier holding of this court concerning the same subject. "Binding authority must be followed unless and until overruled by a body competent to do so." *Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001); *see also id.* at 1170 & n.24 ("A district judge may not respectfully (or disrespectfully) disagree with his learned colleagues on his own court of appeals who have ruled on a controlling legal issue . . . . [C]aselaw on point *is* the law."). There is but one controlling precedent from the tribal courts, and that is *De-Roche*.

[5]A cognizable claim that rests on the federal government's trust obligation is enforceable through the Tucker Act, 28 U.S.C. § 1491, or the

the 1980s, the Supreme Court gave us guidance to determine when an actionable fiduciary duty toward Indians arises.

In *Mitchell I*, 445 U.S. at 541-46, tribal members on the Quinault Indian Reservation protested federal mismanagement of the tribe's timber resources. Although acknowledging that the Indian General Allotment Act of 1887 ("General Allotment Act"), ch. 119, 24 Stat. 388, 25 U.S.C. §§ 331-358 (1976) (§§ 331-333 *repealed by* Pub. L. No. 106-462, § 106(a)(1) (2000)), established a trust relationship on behalf of Indians, the Court found that the relationship was "limited" and did not impose on the government a particular duty to manage timber resources. *Mitchell I*, 445 U.S. at 542. Instead, the federal government's trust responsibilities under the General Allotment Act were merely to prevent alienation of the land and to hold the land "immune from . . . state taxation." *Id.* at 544. Despite rejecting the tribe's claim under the General Allotment Act, the Court remanded the case to the Court of Claims to consider whether other statutes might provide a basis for liability. *Id.* at 546.

When the case returned to it, the Supreme Court permitted a claim to proceed. *Mitchell II*, 463 U.S. 206. The Court examined various timber management statutes that Congress had enacted after the General Allotment Act. *Id.* at 219-24. Those statutes directed the government to manage Indian forest resources, obtain revenue thereby, and pay proceeds to the Indian landowners. The Court held that those statutes imposed strict and detailed duties on the government to manage forest lands. In view of the pervasive and complete control exercised

---

Indian Tucker Act, 28 U.S.C. § 1505. *United States v. Mitchell*, 445 U.S. 535, 538-39 (1980) (*Mitchell I*); *United States v. Mitchell*, 463 U.S. 206, 218, 226 (1983) (*Mitchell II*). A federal court's jurisdiction is identical whether conferred by the Tucker Act or the Indian Tucker Act. *See Mitchell I*, 445 U.S. at 538-39. As a result, for convenience and unless otherwise noted, we refer to both the Indian Tucker Act and the Tucker Act as "the Tucker Act" in this opinion.

by the government over the lands, the statutes confirmed the existence of a fiduciary relationship. *Id.* Thus, the statutes satisfied the requirements for a claim of breach of fiduciary duty because they mandated the payment to Indians of money resulting from the management of Indian timber resources. *Id.* at 224-27.

**[5]** Together, *Mitchell I* and *Mitchell II* form the *Mitchell* doctrine: To create an actionable fiduciary duty of the federal government toward Indian tribes, a statute must give the government pervasive control over the resource at issue. Two 2003 Supreme Court decisions illustrate how the *Mitchell* doctrine applies: *United States v. Navajo Nation*, 537 U.S. 488 (2003), and *United States v. White Mountain Apache Tribe*, 537 U.S. 465 (2003).

We first address *Navajo Nation*. In 1964, the Navajo Nation—with approval from the Secretary of the Interior— entered into a lease with the corporate predecessor of the Peabody Coal Company for the mining of coal on tribal lands. 537 U.S. at 493. The lease provided for low royalty payments to the tribe. *Id.* at 495. Under the terms of the lease, the tribe and the mining company agreed to delegate power to the Secretary of the Interior to adjust the royalty rate to a "reasonable" level on the twentieth anniversary of the lease. *Id.* By the 1980s, the royalties to the Navajo Nation equaled only about 2% of gross proceeds of the coal, while Congress had established a yield of 12.5% for coal mined on federal lands. *Id.* at 495-96.

Eventually, the Navajo Nation and Peabody negotiated a change in the royalty rate to 12.5%, retroactive to 1984. *Id.* at 498. The agreement also included other concessions by Peabody, including acceptance of tribal taxation of coal production. *Id.* at 498-99. In 1987, after the Navajo Tribal Council approved amendments to the lease and a final agreement was signed, the Secretary of the Interior approved the agreement. *Id.* at 500.

The tribe later learned that the Secretary had engaged in ex parte dealings with Peabody, without which, they alleged, the rate could have been as high as 20%. The Navajo Nation filed suit in the Court of Federal Claims, claiming that the Secretary of the Interior had breached the government's trust obligations by approving the 1987 amendments to the lease. *Id.* at 500. The tribe contended that the Indian Mineral Leasing Act of 1938 ("Indian Mineral Leasing Act"), ch. 198, 52 Stat. 347, 25 U.S.C. §§ 396a-496g, imposed a fiduciary obligation on the Secretary of the Interior to maximize financial returns from coal leases on Indian lands and that the royalty approved in 1987 was inadequate. *Navajo Nation*, 537 U.S. at 493.

When the case reached the Supreme Court, the Court confirmed the primacy of *Mitchell I* and *Mitchell II* as "the pathmarking precedents on the question whether a statute or regulation (or combination thereof) 'can fairly be interpreted as mandating compensation by the Federal Government.' " *Navajo Nation*, 537 U.S. at 503 (quoting *Mitchell II*, 463 U.S. at 218). The Court explained the contrast between *Mitchell I* and *Mitchell II* as the difference between a " 'bare trust' " for a limited purpose and " 'full responsibility' " for management of Indian resources. *Id.* at 505 (quoting *Mitchell II*, 463 U.S. at 224). The Court held that a court's analysis of a statute "must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." *Id.* at 506.

Turning to the Indian Mineral Leasing Act, the Court held that the statute failed to establish even the "limited trust relationship," which the Court found insufficient to support a claim for relief in *Mitchell I*, because the statute did not include any trust language. *Id.* at 507-08. Instead, the statute "simply require[d] Secretarial approval before coal mining leases negotiated between Tribes and third parties become effective and authorize[d] the Secretary generally to promulgate regulations governing mining operations." *Id.* at 507 (citations omitted). Further, because the Indian Mineral Leasing Act "aim[ed] to enhance tribal self-determination by giv-

ing Tribes, not the Government, the lead role in negotiating mining leases with third parties," the congressional purpose would be defeated by "[i]mposing upon the Government a fiduciary duty to oversee the management of allotted lands." *Id.* at 508.

On the same day as it issued *Navajo Nation*, the Supreme Court examined the trust doctrine in the context of overseeing the maintenance of buildings on land of the White Mountain Apache Tribe. *White Mountain Apache Tribe*, 537 U.S. 465. In 1870, the United States Army established Fort Apache in the White Mountains of Arizona. *Id.* at 468. In the 1920s, control of the fort was transferred to the Department of the Interior, which used part of the property as a school. *Id.* at 468-69. In 1960, Congress declared that Fort Apache be " 'held by the United States in trust for the White Mountain Apache Tribe, subject to the right of the Secretary of the Interior to use any part of the land and improvements for administrative or school purposes for as long as they are needed for the purpose.' " *Id.* at 469 (quoting Pub. L. No. 86-392, 74 Stat. 8, 8 (1960 Act). In 1976, the National Park Service designated Fort Apache as a National Historic Site. *Id.*

The tribe brought suit, alleging that the Secretary of the Interior exercised the statutory prerogative to use the property, but then failed to perform necessary maintenance and allowed Fort Apache to fall into disrepair. *White Mountain Apache Tribe v. United States*, 46 Fed. Cl. 20, 22 (1999). An engineering assessment estimated that rehabilitating the property in accordance with standards for historic preservation would cost $14 million. *White Mountain Apache Tribe*, 537 U.S. at 469.

The Supreme Court held that an actionable fiduciary relationship existed between the federal government and the tribe. *Id.* at 468. The Court explained that a trust relationship alone is not enough to imply a remedy in damages; "a further source of law [is] needed to provide focus for the trust relationship."

*Id.* at 477. In the case of the White Mountain Apache Tribe, that further source of law was the 1960 Fort Apache statute, which went "beyond a bare trust and permit[ted] a fair inference that the Government [was] subject to duties as a trustee and liable in damages for breach." *Id.* at 474. First, the 1960 Act "expressly define[d] a fiduciary relationship" by providing that Fort Apache was " 'held by the United States *in trust* for the White Mountain Apache Tribe.' " *Id.* (quoting 74 Stat. at 8) (emphasis added). Second, the United States exercised its discretionary authority under the statute to make actual use of the property, "not merely exercis[ing] daily supervision but . . . enjoy[ing] daily occupation." *Id.* at 475. Because the government assumed plenary control over the assets held in trust, the government likewise assumed an obligation, as trustee, to preserve those assets. *Id.*

### 2. *Housing on the Blackfeet Reservation*

To decide whether Plaintiffs have a viable claim for violation of a federal trust responsibility, we must examine the statutes and regulations pertaining to the Blackfeet houses at issue. After having done so, we conclude that HUD did not undertake a trust responsibility toward Plaintiffs to construct houses or to maintain or repair houses.

**[6]** During the period in which the houses were constructed, between 1977 and 1980, HUD provided federal funds to the Blackfeet Housing Authority pursuant to the United States Housing Act of 1937, 42 U.S.C. §§ 1437-1440 (1976). Under that statute and its implementing regulations for Indian housing,[6] HUD provided block grants with which an Indian housing authority could organize the construction of homes through its own contractors. In "Annual Contributions Contracts," HUD agreed to provide a specified amount of money to fund projects undertaken by a tribal housing authority and approved by HUD. 24 C.F.R. §§ 805.102, 805.206 (1977). After securing

---

[6]24 C.F.R. §§ 805.404(a), 805.415, 805.416, 805.421, 805.422 (1977).

funding from HUD, a tribal housing authority contracted with eligible American Indian families. *Id.* § 805.406. Eligible families contributed land, labor, or materials to the building of their houses. *Id.* § 805.408. After occupying its house, each family made monthly payments to the housing authority in an amount calibrated to the family's income. *Id.* § 805.416(a)(1)(ii). The Indian purchasers were responsible for maintaining their houses. *Id.* § 805.418(a).

**[7]** Significantly, the statute under which HUD established that program, 42 U.S.C. § 1437 (1976), provided in relevant part:

> It is the policy of the United States to promote the general welfare of the Nation by employing its funds and credit, as provided in this chapter, to assist the several States and their political subdivisions to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income and, consistent with the objectives of this chapter, *to vest in local public housing agencies the maximum amount of responsibility in the administration of their housing programs*.

(Emphasis added.) For the purpose of our analysis, two points are notable. First, as the text just emphasized demonstrates, Congress gave housing authorities the greatest responsibility in administering their low-income housing programs. That is, Congress specifically intended that HUD *not* assume more responsibility in developing and managing housing projects than was necessary. Second, Congress defined the term "states" to include "Indian tribes, bands, groups, and Nations." 42 U.S.C. § 1437a(7). In other words, the block-grant statute applied across the board to all low-income housing, not specially or specifically to Indian housing, even though HUD promulgated separate regulations for Indian housing. *See Artichoke Joe's Cal. Grand Casino v. Norton*,

353 F.3d 712, 729 (9th Cir. 2003) (reaffirming the rule that statutes are construed liberally in favor of Indians only when the statute is passed for the benefit of Indian tribes and the statute is ambiguous).

**[8]** Under its regulations, HUD had two general controls over Indian housing. First, HUD required that low-income housing meet Minimum Housing Standards, 24 C.F.R. §§ 200.929, 805.212 (1977). Second, new construction could not exceed the "prototype costs" for the project,[7] although the prototype costs could be revised upon request of a housing authority, either at application for a project or later when found to be necessary. 24 C.F.R. §§ 805.213(c), 805.214(b) (1977).

**[9]** Three important points bear emphasis. First, neither restriction was unique to Indian housing. Title 24 C.F.R. § 200.925 (1977) provided that *all* housing built under HUD programs "shall meet or exceed HUD Minimum Property Standards." *See, e.g.*, 24 C.F.R. § 800.205(c)(1) (1977) (mandating that developers provide "detailed information" concerning the application of the Minimum Property Standards in their project applications); 24 C.F.R. § 841.107(c)(2) (1977) (requiring use of the Minimum Property Standards in other HUD-funded construction projects). Similarly, non-Indian housing construction projects had to comply with prototype cost limitations. *See, e.g.*, 24 C.F.R. §§ 841.115(b)(2), pt. 841, app. A (1977) (establishing limitations on dwelling construction and equipment costs based on the area prototype costs).

**[10]** Second, HUD regulations did not require the use of pressure-treated wooden foundations. With respect to foundations, HUD's Minimum Property Standards established minimum criteria in section 601-16. Dep't of Hous. & Urban Dev., *Handbook 4900.1: Minimum Property Standards for One and*

---

[7]Prototype costs are the HUD-approved ceiling or maximum costs for each type of dwelling. 24 C.F.R. § 841.204 (1977).

*Two Family Dwellings* § 601-16 (1973 ed., rev. May 1979) ("*Minimum Property Standards Handbook*"). That regulation provided two alternative sets of minimum requirements, one for concrete or masonry walls below grade, *id.* § 601-16.4, and one for pressure-treated wooden foundations, *id.* at app. E.

**[11]** Third, Indian housing authorities were not rigidly bound by either the Minimum Property Standards or the prototype cost limitations.[8] Indian housing authorities could choose to request variances from both the Minimum Property Standards and the prototype costs, if they believed that local conditions justified modifications. 24 C.F.R. §§ 805.212(a), 805.213(c) (1977). In a handbook published for use by Indian housing authorities, HUD characterized the introductory statements to the handbook on Minimum Property Standards as "stress[ing] the importance of flexibility to meet local conditions." Dep't of Hous. & Urban Dev., *Handbook 7440.1: Interim Indian Housing Handbook* § 3-5(a) (1976 ed., rev. Jan. 1978) ("*Indian Housing Handbook*"). As HUD emphasized:

> The [Indian Housing Authority] is responsible for the planning and development of Indian housing projects. The U.S. Housing Act of 1937 provides that local public housing agencies are to be vested with maximum responsibility for project administration and the Indian Self-Determination and Education Assistance Act emphasizes the importance of maximum Indian self-determination.

---

[8]Variances to the prototype cost limitations were likewise available to non-Indian housing authorities, but under somewhat different rules. 24 C.F.R. § 841.115(2) (1977). However, variances from HUD Minimum Property Standards generally were not available in non-Indian housing programs. *See* 24 C.F.R. § 841.107(c)(2) (1977) (mandating inclusion of HUD Minimum Property Standards as one of construction standards in design of public housing program projects); 24 C.F.R. § 883.208(a)(2) (1977) (requiring the same for Section 8 projects).

*Indian Housing Handbook* § 2-1(a).

Indeed, a 1979 amendment to the Indian housing regulations further emphasized the importance of maximizing Indian self-determination by removing the requirement that Indian housing comply with the HUD Minimum Property Standards in the absence of a waiver. Instead, the amendment required only that the design of Indian housing take into account the Minimum Property Standards, along with several other factors. 24 C.F.R. § 805.212(a) (1979). Thus, at the end of the period during which the housing in question was built, HUD was loosening, not tightening, the reins on the autonomy of Indian housing authorities that were receiving block grants.

By the time Plaintiffs filed their complaint in 2002, a new statutory regime was in effect under which Plaintiffs claim a federal trust obligation to repair or replace their houses.[9] In 1996, Congress enacted the Native American Housing Assistance and Self-Determination Act of 1996 ("NAHASDA"), 25 U.S.C. §§ 4101-4243. As the 1996 statute's statement of congressional findings recognized, federal Indian housing assistance was to be provided "in a manner that recognizes the right of Indian self-determination and tribal self-governance" and with the "goals of economic self-sufficiency and self-determination for tribes and their members." 25 U.S.C. § 4101(6)-(7).

Under NAHASDA, HUD makes annual block grants, in amounts determined by a formula, to a tribe or its designated

---

[9] In 1988, Congress moved the authorization for Indian low-income housing to Title II of the United States Housing Act and formalized the Indian housing program. Indian Housing Act of 1988, 42 U.S.C. §§ 1437aa-1437ee (1988), *repealed by* Native American Housing Assistance and Self-Determination Act of 1966, Pub. L. No. 104-330, 110 Stat. 4016 ("NAHASDA"). The 1988 statute did not govern at the time the Blackfeet housing was built, nor does it govern presently. For our purposes, the 1988 statute does not affect the analysis.

housing entity (such as an Indian housing authority), to carry out activities related to the provision of affordable housing. 25 U.S.C. §§ 4111(a), 4152; 24 C.F.R. §§ 1000.201, 1000.202, 1000.206, 1000.301-.340. To receive a block grant, a tribe must submit to HUD an Indian Housing Plan that meets certain requirements and that is subject to HUD's approval. 25 U.S.C. § 4111(b); 24 C.F.R. § 1000.201. But the housing plan is to be "locally driven." 24 C.F.R. § 1000.220. And HUD's statutorily prescribed role—in addition, of course, to providing the block grants themselves—is generally confined to "a limited review of each Indian housing plan," and even then "only to the extent that [HUD] considers review is necessary." 25 U.S.C. § 4113(a)(1). The grant, once made, is subject to tribal control; the recipient, rather than HUD, is responsible for operating the housing program, including the continued maintenance of housing. 25 U.S.C. § 4133. HUD's responsibility consists primarily of oversight and audit, to ensure that federal funds are spent for the intended purpose. 24 C.F.R. § 1000.520.

**[12]** Ultimately, no statute ever required tribes to form housing authorities. No statute obliged Indian housing authorities, once formed, to seek federal funds. No statute committed the United States itself to construct houses on Indian lands or to manage or repair them. Indeed, the relevant regulations expressly imposed inspection duties on Indian housing authorities, independently of HUD, including any enforcement of warranties. 24 C.F.R. §§ 805.221(a), 805.417(a) (1977).

**[13]** No statute has imposed duties on the government to manage or maintain the property, as occurred in *Mitchell II*, nor has any HUD regulation done so. Unlike in *White Mountain Apache Tribe*, here no statute has declared that any of the property was to be held by the United States in trust, nor did the United States occupy or use any of the property. In the present case, there is plenary control of neither the money nor the property.

**[14]** Instead, this case most closely resembles *Navajo Nation*. Just as the Indian Mineral Leasing Act required Secretarial approval of leases, but did not oblige the Secretary to negotiate them, the United States Housing Act gave HUD a right of final inspection with respect to construction and design materials, 24 C.F.R. §§ 805.211-805.217 (1977), but did not oblige HUD to select them. Here, as there, the statute failed to include a federal managerial role. Here, as there, Congress expressed the aim of giving the lead role to an entity other than the government.

**[15]** Although we must take as true Plaintiffs' allegations that HUD in fact required the use of wooden foundations and that those foundations caused injury, the government did not enter into a trust relationship merely because HUD did not approve an alternative design. Although HUD's power to approve a design implies the power to reject a design as well, the Supreme Court made clear in *Mitchell I* and *Navajo Nation* that such oversight authority alone (whether exercised wisely or unwisely) cannot create the legal relationship that is a threshold requirement for Plaintiffs to recover on a trust theory. Even if HUD's actions in mandating certain construction materials and methods may have been arbitrary or capricious, those actions alone cannot alter the legal relationship between the parties.

**[16]** In summary, under the Housing Act, Indian housing authorities (such as the Blackfeet Housing Authority) applied to HUD for loans to enable *the housing authority* to develop low-income public housing designed to be sold to eligible members of the tribe. Under NAHASDA, block grants could be used *by the tribe* or its designated housing entity to repair or replace housing. As with any grant of federal funds, certain requirements had to be met to obtain and spend the funds. But the federal government held no property—land, houses, money, or anything else—in trust. The federal government did not exercise direct control over Indian land, houses, or money by means of these funding mechanisms. The federal

government did not build, manage, or maintain any of the housing. For these reasons, we adhere to our earlier ruling that the district court properly dismissed Plaintiffs' claim that HUD violated a trust responsibility. *Marceau*, 455 F.3d at 983-85.

## C. *Administrative Procedure Act*

**[17]** Plaintiffs allege that they are entitled to relief under the APA, 5 U.S.C. §§ 702-706. The APA authorizes suit by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. When reviewing an APA claim, a court may only (1) "compel agency action unlawfully withheld or unreasonably delayed"; or (2) "hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(1)-(2)(A). "[C]entral to the analysis . . . is that the only agency action that can be compelled under the APA is action legally *required*." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 63 (2004).

**[18]** As our earlier opinion explained, *Marceau*, 455 F.3d at 985, a claim under the APA requires, among other things, that the claimant seek "relief other than money damages." *See also Bowen v. Massachusetts*, 487 U.S. 879, 895-902 (1988) (analyzing the meaning of "money damages" in 5 U.S.C. § 702). Examination of the relief that Plaintiffs seek does not stop at the parties' allegations. Instead, "the substance of the pleadings must prevail over their form." *Amoco Prod. Co. v. Hodel*, 815 F.2d 352, 361 (5th Cir. 1987); *see also Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 645 (9th Cir. 1998) (examining plaintiff's APA claims and concluding that the "claims are not 'for money damages' "). We must "discern the nature of the relief being sought and focus on the type of relief that will result from the action." *Amoco Prod. Co.*, 815 F.2d at 362.

**[19]** In this case, Plaintiffs request equitable and injunctive relief. Specifically, they seek a declaration that HUD has violated its legal obligations, and they seek equitable relief in the form of repairs (or, where necessary, rebuilding) of their homes.

**[20]** According to Plaintiffs, a judicial declaration that HUD approved the construction designs and materials in a manner that violated HUD regulations could be used as leverage with Congress to enact remedial legislation. In their alternative claim for injunctive relief, Plaintiffs ask that HUD simply "fix" the construction defects that allegedly caused the health problems suffered by some of the Blackfeet homeowners. On reconsideration, we conclude that Plaintiffs' claims for declaratory and injunctive relief thus are distinct from money damages.

**[21]** The district court erred in dismissing Plaintiffs' claims for declaratory and injunctive relief under the APA before allowing adequate development of the record. According to the Amended Complaint, HUD required the use of "materials and construction techniques which do not meet HUD's own standards or standards used in the industry generally." HUD was required to approve "all contracts in connection with the development of a Project, including contracts for work, materials, or equipment, or for architectural, engineering or legal services." *See* 24 C.F.R. § 805.211 (1977).[10] The regulations that were in effect when HUD approved the 153 Blackfeet homes in the late 1970s provided that housing materials had to meet minimum property standards. 24 C.F.R. § 805.212 (1979); *Indian Housing Handbook* §§ 3-19, 3-20. Those mini-

---

[10]We note that HUD approval of contracts was common to all HUD housing programs. *See* Indian Housing; final rule, 44 Fed. Reg. 64,204, 64,206 (Nov. 6, 1979 ) ("The requirement for HUD approval of development contracts is in accordance with the standard rule for the entire public housing program, Indian and non-Indian, and is not considered unduly restrictive.")

mum property standards permitted the use of chemically treated lumber in the foundations of single- and double-family dwellings. *See* 24 C.F.R. § 200.925 & pt. 200, subpt. S, app. (permitting "[w]ater borne preservatives[,] [l]ight petroleum solvent penta-solution [and] [v]olatile petroleum solvent penta-solution"); *see also Minimum Property Standards* Handbook app. E, pp. E-1 and E-2.

HUD's regulations neither permitted nor proscribed the particular chemicals (such as arsenic) that Plaintiffs allege caused the unsafe housing conditions. Because the case is before us on a motion to dismiss the Amended Complaint, the record is silent about whether arsenic-treated lumber was within industry standards at the time. The record is equally silent about whether Plaintiffs requested the use of different materials or methods and about whether HUD failed to comply with its own regulations. At this stage in the litigation, though, we must accept as true Plaintiffs' allegations that the construction materials and methods were substandard and that HUD improperly mandated the use of the wooden foundations at issue.

For a similar reason, the district court prematurely dismissed Plaintiffs' claim for injunctive relief. Under Count Two of the Amended Complaint, Plaintiffs allege that, for more than 15 years, they "repeatedly asked the Blackfeet Housing Authority and HUD to remedy the dangerous housing conditions." NAHASDA permits a tribal authority to seek block grants from HUD for "affordable housing authorities," *see* 25 U.S.C. § 4111, which include "operating assistance for housing previously developed or operated under a contract between the Secretary and Indian housing authority," *id.* § 4132(1). To the extent that Plaintiffs requested remedial measures under the repealed Indian Housing Act, HUD had to consider their requests and then exercise discretion. *See S. Utah Wilderness Alliance*, 542 U.S. at 64 (holding that a failure to act can be cognizable under the APA). In summary, Plaintiffs' allegations—that HUD arbitrarily and capriciously

declined to consider requests for remedial funds, as required by 24 C.F.R. § 905.270 before the Indian Housing Act's repeal and by 25 U.S.C. §§ 4111 and 4132(1) under NAHASDA—suffice to bring the claim for injunctive relief under the APA.

## D.  *Breach of Contract Claims*

We readopt our earlier opinion, *Marceau*, 455 F.3d at 986, concerning Plaintiffs' breach of contract claims against HUD. The district court lacked jurisdiction to hear those claims, so there remains nothing for us to review.

AFFIRMED in part; REVERSED in part and REMANDED. The parties shall bear their own costs on appeal.

PREGERSON, Circuit Judge, dissenting:

I concur in the majority's rulings on tribal immunity and the Administrative Procedure Act. I dissent with regard to the majority's analysis of federal trust responsibility, and write separately on that issue.

## I.    Factual Background[1]

Pursuant to the goals set out in the United States Housing Act of 1937, 42 U.S.C. §§ 1437-1440, HUD developed the Homeownership Program. HUD designed the Homeownership Program to meet the housing needs of low-income American Indian families. HUD entered into agreements called "Annual Contributions Contracts" with tribal housing authorities under which HUD agreed to provide a specified amount

---

[1]These facts, except as noted, are taken from Plaintiffs' complaint, which is presumed true for purposes of this Rule 12(b)(6) proceeding.

of money to fund projects undertaken by the housing authorities and pre-approved by HUD. *See* 24 C.F.R. § 805.102 (1979); *id.* § 805.206. After securing funding from HUD, a tribal housing authority would then contract with eligible American Indian families. *See id.* § 805.406. The program required families to contribute land, labor, or materials to the building of their house, *see id.* § 805.408, and after occupying the house, each family made monthly payments in an amount calibrated to their income, *see id.* § 805.416(a)(1)(ii). The homebuyers were responsible for maintenance of the house. *See id.* § 805.418(a).

Until 1988, when the program was formalized in the Indian Housing Act of 1988, 42 U.S.C. §§ 1437aa-1437ee (1988), *repealed by* Native American Housing Assistance and Self-Determination Act of 1996, Pub. L. No. 104-330, 110 Stat. 4016 (1996), HUD operated the Homeownership Program under a series of regulations and its "Indian Housing Handbook." *See* H.R. Rep. No. 100-604 (1988), *reprinted in* 1988 U.S.C.C.A.N. 791, 793.

In 1977, the Blackfeet Tribe established a separate entity, the Blackfeet Housing Authority, as HUD regulations required. *See* 24 C.F.R. § 805.109(c) (1979) (requiring, as a prerequisite to receiving Homeownership Program funding, that tribes form a tribal housing authority). HUD published a model enabling ordinance, *reprinted in* 24 C.F.R. § 805, subpt. A, app. I (1979), which the Blackfeet Tribe adopted. The enabling ordinance charged the Blackfeet Housing Authority with "[a]lleviating the acute shortage of decent, safe and sanitary dwellings for persons of low income" and "[r]emedying unsafe and [u]nsanitary housing conditions that are injurious to the public health, safety and morals." Blackfeet Tribal Ordinance No. 7, art. II, §§ 1-2 (Jan. 4, 1977). Thereafter, HUD granted the Housing Authority authorization and funding to build 153 homes.

Construction of the homes took place between 1979 and 1980. The homes, at least in retrospect, were not constructed

well. The homes were built with wood foundations, and the wood products used to build the foundations were chemically treated with arsenic and other toxic chemicals. Plaintiffs allege, as the crux of their claim, that HUD *required* the use of wood foundations over the objection of tribal members, and that the Housing Authority acceded to that directive.

In the ensuing years, the foundations were, predictably, vulnerable to moisture accumulation and structural instability. Today, some of the houses are uninhabitable due to toxic mold and dried sewage residues. There has been a high incidence of cancer, asthma, kidney failure, respiratory problems, and other serious health problems among residents of the homes. Many residents have been advised to leave their houses for health reasons. Some residents, however, cannot leave because there are, quite simply, no affordable housing options in the area.

Plaintiffs purchased or leased these Homeownership Program homes either directly or indirectly from the Housing Authority. They made significant monthly payments and investments of their own time and/or resources, as required under the Homeownership Program. After it became clear that the houses were substandard and hazardous, Plaintiffs sought assistance from the Blackfeet Housing Authority and from HUD in remedying the construction defects. When they received no assistance from either entity, Plaintiffs filed this class action complaint.

## II.   Analysis

### A.

Plaintiffs allege that HUD has violated its trust responsibility to tribal members.[2] The federal government has substantial

---

[2]Count Three of Plaintiffs' original complaint alleged that HUD has violated: (a) the United States Housing Act of 1937, 42 U.S.C. §§ 1437-

trust responsibilities toward Indians. These duties are part of the nature of the government-Indian relationship. "[A] fiduciary relationship necessarily arises when the Government assumes . . . elaborate control over forests and property belonging to Indians." *United States v. Mitchell*, ("*Mitchell II*"), 463 U.S. 206, 225 (1983).

### 1.  *Historical Framework*

The federal government-Indian trust relationship dates back over a century. To appreciate the nature and extent of the government's responsibilities, and its failure to discharge them, I review the history of the government-Indian trust relationship.

The United States' relationship with the Indian tribes has almost always been "contentious and tragic." *Cobell v. Norton*, 240 F.3d 1081, 1087 (D.C. Cir. 2001). In the early days of this nation, the federal government sought to put an end to the communal living and nomadic life common to so many tribes. The government (by treaty and/or by force) moved Indians onto reservations. *See, e.g., Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1 (1831).

In the second half of the nineteenth century, the government replaced its policy of relocation with one of assimilation. This assimilationist policy began with treaties negotiated with individual tribes, and was eventually enacted into federal law with passage of the General Allotment Act of 1887, also known as the "Dawes Act," ch. 119, 24 Stat. 388 (as amended at 25 U.S.C. § 331 et seq.). Under the General Allotment Act,

---

1437x; (b) the Indian Housing Act, 42 U.S.C. §§ 1437aa-1437ee; (c) the Native American Housing Assistance and Self-Determination Act of 1996, 25 U.S.C. §§ 4101-4243; and (d) the Housing Act of 1949, 42 U.S.C. §§ 1441-1490. On appeal, Plaintiffs did not challenge the district court's holding that no express or implied right of action existed under those statutes. Accordingly, I do not consider those statutes here.

beneficial title of the lands allotted to tribes vested in the United States as trustee for individual Indians.[3]

The government then began to divide reservations and other Indian lands into individual parcels. The government essentially took the land it had earlier set aside for Indian tribes and re-allotted the land to individual tribe members. *See* Felix S. Cohen, Handbook of Federal Indian Law § 1.04 (2005 ed.). "The objectives of allotment were simple and clear cut: to extinguish tribal sovereignty, erase reservation boundaries, and force assimilation of Indians into the society at large." *Yakima v. Yakima Indian Nation*, 502 U.S. 251, 254,(1992). Once tribal lands were allotted in fee to individual tribal members, white settlers could purchase the lands from tribe members.

The federal government ceased allotting tribal lands to individuals with the enactment of the Indian Reorganization Act of 1934 ("IRA"), 48 Stat. 984 (codified as amended at 25 U.S.C. § 461 et seq.). Lands already allotted remained so, but the IRA provided that unallotted Indian lands would be returned to tribal ownership. 25 U.S.C. § 463.

In the 1950s, federal Indian policy shifted yet again as Congress adopted a "termination policy." Under termination, Congress sought to release tribes from federal supervision and to terminate the government-Indian relationship. The purpose of this policy shift was specifically to sever the trust relationship. *Cobell*, 240 F.3d at 1088. During this period, Congress terminated numbers of tribes and withdrew its recognition of those tribes.

The termination policy was no more successful than earlier assimilation efforts, and was soon replaced with the current policy of self-determination and self-governance. In 1975

---

[3]Where tribes resisted allotment, it could be imposed. *See* Act of June 28, 1898, ch. 517, 30 Stat. 495 ("Curtis Act").

Congress enacted the Indian Self-Determination and Education Assistance Act, Pub. L. No. 93-638, 88 Stat. 2203 (1975). Today, much tribally owned land is held in trust "indefinitely." 25 U.S.C. § 462.

### 2.   *The Mitchell Doctrine*

Here, Plaintiffs argue that, as tribal members, HUD owed them a trust duty and it breached that duty. Claims based on the tribal trust duty are enforceable via the Tucker Act. In 1980, the Supreme Court held that the General Allotment Act, on its own, did not provide a substantive damage remedy enforceable through the Tucker Act. *United States v. Mitchell* (*Mitchell I*), 445 U.S. 535, 541-46 (1980).

The tribe in *Mitchell I* protested federal mismanagement of its timber resources. Although acknowledging that the General Allotment Act did indeed establish a trust relationship on behalf of the Indians, the Court found the relationship to be a "limited" one that did not impose a duty to manage timber resources. *Id.* at 542. Under the Court's reading of the General Allotment Act, the trust responsibilities of the federal government under the statute were merely to prevent alienation of the land and to hold the land "immune from . . . state taxation." *Id.* at 544.

Although the *Mitchell I* Court rejected the tribe's claim as premised solely on the General Allotment Act, it remanded to the Court of Claims for consideration of whether other statutes might provide a basis for liability. *Id.* at 546. Thus, the Court left the door open to continued pursuit of the claim against the federal government under alternative sources of law.

When the case returned to it, the Supreme Court permitted the Tucker Act suit to proceed. *Mitchell II*, 463 U.S. 206. The Court examined various timber management statutes enacted subsequent to the General Allotment Act, which directed the

government to manage Indian forest resources, obtain revenue thereby, and pay proceeds to the landowners. *Id.* at 219-24. The Court held that these statutes imposed strict duties upon the government to manage forestlands and specifically required the government to take into account the maintenance of the productive use of the land, the highest and best use of the land, and the financial needs of the owner and the owner's heirs. *Id.* The Court held that the statutes confirmed the existence of a fiduciary relationship, especially given the pervasive and complete control exercised by the government over these lands. *Id.*

Finally, in *Mitchell II* the Court concluded that because this fiduciary relationship specifically prescribed management of Indian timber resources, these statutes could fairly be interpreted as mandating the payment of money — thereby satisfying the standard for a Tucker Act action. *Id.* at 224-27. Moreover, the Court stated, absent a damages remedy, the fiduciary obligations of the United States would be largely unenforceable, because prospective relief would be inadequate and fail to deter federal officials from defaulting in their trust duties. *Id.* at 227-28.

Together, *Mitchell I* and *II* form the *Mitchell* doctrine, which outlines the circumstances under which the federal government owes a fiduciary duty to tribes. These cases indicate that the government's obligation must go beyond the mere general obligation that it owes to domestic dependent sovereigns. A tribe must demonstrate specific statutory language indicating that the federal government has pervasive control over the resource at issue. Two decisions from 2003 clarify the *Mitchell* doctrine: *United States v. Navajo Nation*, 537 U.S. 488 (2003), and *United States v. White Mountain Apache Tribe*, 537 U.S. 465 (2003).

In 1964, the Navajo Nation, with the approval of the Secretary of the Interior, entered into a lease with the corporate predecessor of the Peabody Coal Company for coal mining on

tribal lands. *Navajo Nation v. United States*, 46 Fed. Cl. 217, 221 (Ct. Cl. 2000). The lease provided for low initial royalty payments to the tribe. *Id.* Pursuant to the terms of the lease, the tribe and the mining company agreed to delegate power to the Secretary of the Interior to adjust the royalty rate to a "reasonable" level on the twentieth anniversary of the lease. *Id.* By the 1980s, the royalty payments to the Navajo Nation were only about two percent of gross proceeds on the coal, well below the twelve-and-a-half percent Congress had established for coal mined on federal lands. *Navajo Nation*, 537 U.S. at 496.

Subsequently, the Navajo Nation and the Peabody Mining Company negotiated a change in the royalty rate to twelve-and-a-half percent, retroactive to 1984, and included other concessions such as coal company acceptance of tribal taxation of coal production. *Id.* at 498. In 1987, after the Navajo Tribal Council approved the lease amendments and a final agreement was signed, Interior Secretary Hodel approved the negotiated agreement. *Id.* at 500. The tribe later learned that Secretary Hodel had engaged in backroom ex parte dealings with the coal company, without which the royalty rate would likely have been closer to twenty percent (not the twelve-and-a-half percent negotiated).

In 1993, the Navajo Nation filed suit in the Court of Federal Claims under both the Tucker Act and the Indian Tucker Act, claiming that the Secretary of the Interior breached the government's trust obligations by approving the 1987 amendments to the lease. *Navajo Nation*, 46 Fed. Cl. at 220-21. The tribe contended that the Indian Mineral Leasing Act imposed a fiduciary obligation on the Secretary of the Interior to maximize the financial returns from coal leases and that the twelve-and-a-half percent royalty rate approved in 1987 was manifestly inadequate. *Id.* at 219-21.

In *Navajo Nation*, the Supreme Court confirmed the continued primacy of *Mitchell I* and *Mitchell II* as "the pathmarking

precedents on the question whether a statute or regulation (or combination thereof) 'can fairly be interpreted as mandating compensation by the Federal Government.' " 537 U.S. at 503 (quoting *Mitchell II*, 463 U.S. at 218). The Court explained the contrast between *Mitchell I* and *Mitchell II* as that between a "bare trust" for limited purposes and "full responsibility" by the government for management of Indian resources. *Id.* at 505 (quoting *Mitchell II*, 463 U.S. at 224). The Court held that the statutory "analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." *Id.* at 506. However, once such a full fiduciary duty has been identified in the pertinent statute, the Court said that the availability of damages as a remedy "may be inferred," even if not expressly referred to in the statute. *Id.*

Turning to the Indian Mineral Leasing Act, the *Navajo Nation* Court ruled, "[t]he IMLA simply requires Secretarial approval before coal mining leases negotiated between Tribes and third parties become effective and [further] authorizes the Secretary generally to promulgate regulations governing mining operations." *Id.* at 507. The statute, by failing to include a federal managerial role, did not establish the "limited trust relationship" needed to support a claim for relief. *Id.* at 507-08.

Further, the Court explained that "imposing fiduciary duties on the Government here would be out of line with one of the statute's principal purposes." *Id.* at 508. Because "[t]he IMLA aims to enhance tribal self-determination by giving Tribes, not the Government, the lead role in negotiating mining leases with third parties," the congressional purpose would be defeated by "[i]mposing upon the Government a fiduciary duty to oversee the management of allotted lands." *Id.*

In an opinion issued the same day as *Navajo Nation*, the Supreme Court examined the trust doctrine in the context of overseeing the maintenance of buildings on land of the White

Mountain Apache Tribe. *United States v. White Mountain Apache Tribe*, 537 U.S. 465 (2003).

In 1870, the United States Army established Fort Apache in the White Mountains of east-central Arizona. *White Mountain Apache Tribe v. United States*, 46 Fed. Cl. 20, 22 (1999). In the 1920s, control of the fort was transferred to the Department of the Interior, and part of the property was used as a school. *Id.* In 1960, Congress declared that Fort Apache "be held by the United States in trust for the White Mountain Apache Tribe, subject to the right of the Secretary of the Interior to use any part of the land and improvements for administrative or school purposes for as long as they are needed for that purpose." Pub. L. No. 86-392, 74 Stat. 8, 8 (1960). In 1976, the National Park Service designated Fort Apache as a National Historic Site. *White Mountain Apache Tribe*, 46 Fed. Cl. at 22.

As alleged by the tribe, the Secretary of the Interior exercised the statutory prerogative to use the property, but then allowed Fort Apache to fall into disrepair and failed to perform necessary maintenance. *Id.* The tribe commissioned an engineering assessment of the property. The assessment reported that it would cost roughly $14 million to rehabilitate the property in accordance with standards for historic preservation. *White Mountain Apache Tribe*, 537 U.S. at 469. The tribe brought suit in the Court of Claims arguing that the government had breached its fiduciary duty.

The Supreme Court held there to be an actionable fiduciary relationship. *Id*. at 468. In light of the *Mitchell* cases, the Court concluded that the Fort Apache trust statute "goes beyond a bare trust and permits a fair inference that the Government is subject to duties as a trustee and liable in damages for breach." *Id.* at 474. First, the 1960 Act "expressly defines a fiduciary relationship" by providing that Fort Apache be "held by the United States in trust for the White Mountain Apache Tribe." *Id.* (citing statute). Second, the United States

exercised its discretionary authority to make actual use of the property, thus "not merely exercis[ing] daily supervision but . . . enjoy[ing] daily occupation." *Id.* at 475.

Accordingly, the Court held when the government assumes plenary control over assets held in trust, the government likewise assumes an obligation as trustee to preserve those assets, even absent express statutory delineation of duties of management and conservation. *Id.* As the Court observed, "elementary trust law, after all, confirms the commonsense assumption that a fiduciary actually administering trust property may not allow it to fall into ruin on his watch." *Id.* The Court explained that a trust relationship between the United States and Native Americans alone is not enough to imply a remedy in damages, and thus "a further source of law [is] needed to provide focus for the trust relationship." *Id.* at 477. But "once that focus [is] provided, general trust law [is to be] considered in drawing the inference that Congress intended damages to remedy a breach of obligation." *Id.*

The *Mitchell* cases, *Navajo Nation*, and *White Mountain Apache* together define the state of law with respect to the Indian trust doctrine. These cases stand for the proposition that tribes may successfully bring cases before the Court of Federal Claims seeking money damages based on the government's breach of a fiduciary duty. Hence, the trust doctrine gives rise to a viable Tucker Act claim. *See* George C. Sisk, *Yesterday and Today: Of Indians, Breach of Trust, Money and Sovereign Immunity* 29 Tulsa L. Rev. 313, 317 (2003) (summarizing these important cases and discussing their interplay with the Tucker Act and the Indian Tucker Act).

Before the Court decided these cases, tribes and tribal members had to identify specific statutes stating a right to monetary relief from the government. *Id.* at 337. With these four cases, the Court has clarified that the trust relationship itself can establish a right to monetary relief. However, plaintiffs must go beyond asserting the general trust relationship

between tribes and the government, and must allege a specific trust obligation tied to the resource at stake. In *Mitchell II*, the Court recognized that statutes established a pervasive federal regulation over timber resources adequate to demonstrate a trust relationship. In *White Mountain Apache*, the Court held that the federal government's occupation and management of land and buildings established a trust relationship. These cases demonstrate that where statutes and behavior create pervasive governmental control over a tribal resource, a specific trust relationship and concomitant fiduciary duty are created.

In *Navajo Nation*, the Court examined the Interior Department's control over mining resources and found no pervasive control. There, the Court held that the statutory framework only established a minor role for the federal government — signing and approving mining leases that were negotiated and managed by the tribes. The Court found it particularly significant that the statute regarding the leases was designed to keep control of the resource in the hands of the tribe. In the wake of these cases, determining whether there is a trust relationship sufficiently detailed to create a viable claim under the Tucker Act requires a tailored inquiry into the resource at stake, the role of the federal agency involved, and the attendant statutory structure.

### 3.   *Housing on the Blackfeet Reservation*

In assessing whether plaintiffs have a potential claim under the tribal trust doctrine, we examine the level of control the federal government exercises over the tribal asset at issue. Here, the asset is housing. The federal government's pervasive control of housing on the Blackfeet reservation relates directly to the trust obligations the government owed the tribe.

Congress's decision to hold tribal land in trust has the practical result of eliminating the private housing market on tribal land because neither individual members of the tribe nor the tribe itself has an ownership interest that can be used as secur-

ity. The government's decision to hold tribal land in trust shows Congress' intent to maintain pervasive control over the resource at stake and gives rise to a fiduciary duty in the government-created tribal housing market. However admirable the government's motivations, the decision to take tribal land in trust has had adverse consequences: by holding tribal land in trust and preventing alienation, the federal government foreclosed many options that exist in most private housing markets. In a recent publication, the United States Commission on Civil Rights reported that American Indians have consistently found it difficult to obtain mortgages on their land because the land is held in trust and therefore cannot be used as collateral. *See* United States Comm. on Civil Rights, A Quiet Crisis: Federal Funding and Unmet Needs in Indian Country at 64, *available at* http://www.usccr.gov/pubs/na0703/na0731.pdf; *see also* H.R. Rep. 100-604, reprinted in 1988 U.S.C.C.A.N. 791, 795.

Similarly, private housing developers have been deterred from entering tribal housing markets because the property cannot be alienated. *Id.* at 64. The federal government exercises pervasive control over tribal land, and in so doing, severely limits the tribe's ability to control its own economic development in the area of housing. In fact, according to one House Report relating to the passage of the Indian Housing Act, HUD's Homeownership Program was the "only reasonable source of housing in many reservations," see H.R. Rep. 100-604, reprinted in 1988 U.S.C.C.A.N. 791, 795, in part because the land was held in trust.

Thus, while the goal of the General Allotment Act was to prevent unwise tribal alienation of the land, the result was to prevent building and improving housing. Restrictions operating on Indian lands prevent developers from entering the private tribal housing market, and leave tribes with no option but to wait for the federal government to provide decent, safe, and sanitary housing.

The government has often undertaken to provide tribal housing as an exercise of its special responsibility to the tribes. Congress has acknowledged federal control over tribal land and the government's attendant obligations. Congress has specifically noted that the federal government's general trust relationship with the tribes creates a responsibility for the federal government to remedy the deplorable housing conditions on reservations. *See* Native American Housing Assistance and Self-Determination Act ("NAHASDA"), 25 U.S.C. § 4101(2)-(5). NAHASDA recognizes that:

> Congress, through treaties, statutes, and the general course of dealing with Indian tribes, has assumed a trust responsibility for the protection and preservation of Indian tribes and for working with tribes and their members to improve their housing conditions and socioeconomic status so that they are able to take greater responsibility for their own economic condition; . . . [Moreover,] *providing affordable homes in safe and healthy environments is an essential element in the special role of the United States* in helping tribes and their members to improve their housing conditions and socioeconomic status.

25 U.S.C. § 4101(4)-(5) (emphasis added).

As indicated in the findings under NAHASDA, the federal government's duty to remedy tribal housing conditions existed even before NAHASDA — it derives from treaties and the "general course of dealing" with tribes. During the process of forcing the tribes onto reservations, many tribes were explicitly promised housing in exchange for land cession. *See* Virginia Davis, *A Discovery of Sorts: Reexamining the Origins of the Federal Indian Housing Obligation*, 18 Harv. BlackLetter L.J. 211, 215-23 (2002). Others were promised money to "promote their civilization." *Id.* at 218-19; *see, e.g., White Mountain Apache Tribe v. United States*, 26 Cl.Ct. 446, 465, 466-67 (1992). The Blackfeet Tribe signed

such a treaty. The Court of Claims has held that treaty language such as the "requisites to 'promote civilization'" includes housing. *White Mountain Apache*, 26 Cl. Ct. at 466-67. Treaty language and the relationship between the tribes and the federal government demonstrate that the federal government has long promised that it would assist American Indian tribes in providing housing.

When tribal land was taken into trust under the General Allotment Act, it was done to ensure that every Indian could have a "homestead of his own with assistance by the government to build houses and fences, and open farms." *See* Davis, 18 Harv. BlackLetter L.J. at 224 (quoting Comm'r of Indian Affairs, Annual Report iv-v (1885)). Henry Dawes, proponent of the General Allotment Act, stated that housing was a central element of the Act. *Id.* at 224. When the government took the land in trust, it committed itself to play a major role in housing the trust land's occupants.

*Navajo Nation* and *White Mountain Apache* delineate the ends of a continuum along which courts examine the *Mitchell* doctrine. In *White Mountain Apache*, the federal government's involvement was pervasive. The federal government occupied the land, built and maintained structures on the land, and managed the land. Additionally, federal legislation explicitly recognized a trust relationship between the government and the tribe with respect to management of the land. When the federal agency allowed the buildings on the land to fall into dangerous disrepair, the Court held that it had a fiduciary obligation regarding the buildings and the land. The obligations surrounding the buildings had also been heightened by the National Park Service's designation of the area as a National Historic Site. Thus, the case demonstrates on-site involvement, oversight of the building and management of the structure, funding, and a statutory framework explicitly recognizing the trust relationship.

The present case is similar in several respects. The federal government controlled the design of the houses, set the build-

ing standards, approved all the designs and contracts, and provided funding. HUD's control of housing on tribal land and the Homeownership Program was pervasive.

HUD set the "prototype costs" for each locality, and required that the cost of construction and equipment could not exceed the prototype cost by more than ten percent. *See* Department of Housing and Urban Development, Manual 7440.1: Indian Housing Handbook 3-29 (March 1976). These prototype costs were based on the minimum property standards, standards that permitted the use of the wood foundations at issue here. Housing authorities proposed projects within the prototype cost, "carefully consider[ing] costs . . . to be sure that the project is completed at the lowest possible cost." Indian Housing Handbook 3-40. Even then, however, HUD approved the "development cost" allocated for each project. Indian Housing Handbook 3-40; 5-25. Any variation from the minimum property standards had to be HUD-approved. Indian Housing Handbook 5-25. HUD also had final say over design of the houses and the authority to alter tribally proposed designs in any way. The Indian Housing Handbook has a sample of every form, every contract, every checklist to be used from the first step to the last.

Thus, the only autonomy permitted to tribal housing authorities was the right to design a home within the price range set by HUD, a price range based on HUD's minimum property standards. Even then HUD could change the plans. This is hardly "maximum responsibility for project administration" promised to the Housing Authority by HUD. *See* HUD Housing Manual 2-1.

The facts of this case confirm that the tribe had little control over how HUD housing would be built. Although the Blackfeet Housing Authority and occupants of the housing vigorously opposed use of wood foundations, it appears that they had no power to control the materials used. Thus, not only was HUD funding the only viable lending option on

most tribal property, but it exerted almost total control over how the tribes would use the housing money they received to construct homes on land the government held in trust.

Thus, as with *Mitchell II*, there is pervasive management of a tribally owned resource to the exclusion of control by the tribal landholders. And, unlike *Mitchell I*, the very purpose for which the land was taken in trust — to prevent alienation — caused the injury at issue. Just as in *Mitchell II*, tribes were squeezed out of any role in their own tribal housing market.

The current case contrasts with the minimal federal control at issue in *Navajo Nation*. There, the Interior Department's only role was to approve leases. It did not manage the leases, negotiate the leases, or dictate their terms. The Interior Department did not provide any funding or oversight beyond lease approval. Although the Interior Secretary appeared to have conducted himself improperly by revealing confidential information to the mineral lessee, the Court held that there was no fiduciary duty and no trust asset in connection with the mineral leases. *Navajo Nation* represents minimal involvement, and it stands in sharp contrast to the pervasive regulation of housing on the Blackfeet reservation. The framework in this case is more akin to the system in *White Mountain Apache*.

An important element in both *Navajo Nation* and *White Mountain Apache* (and in the *Mitchell* cases) was the statutory framework regarding the resource in question. In *White Mountain Apache*, statutory language used the word "trust" when acknowledging the obligation the government owed the tribe in relation to management of tribal land. In *Navajo Nation*, the statutory framework gave the tribe management of the resource. In *Mitchell II*, the Court examined several timber management statutes and noted that the statutory framework showed evidence of an intent by the federal government to pervasively control the tribe's timber resources. Based on the importance of statutory framework in a tribal trust analy-

sis, the determining factor in the present analysis lies in the housing statutes that resulted in the construction of the substandard homes.

The homeowners base their trust claims on five statutes: the United States Housing Act of 1937 and 1949, 42 U.S.C. § 1437-1437x; the National Housing Act, 12 U.S.C. §§ 1715l(a), 1738(a); the Indian Housing Act of 1988, 42 U.S.C. § 1437aa-ff; and the Native American Housing and Self-Determination Act of 1996 ("NAHASDA"), 25 U.S.C. §§ 1702-1750.

At the time the houses were constructed for low-income families on the Blackfeet Indian Reservation in the 1970s, there was no specific statutory enactment applicable only to public housing on Indian lands. Federal low-income housing legislation was generally found in the U.S. Housing Act. *See* 42 U.S.C. §§ 1437-1437j (1976). The provisions in the U.S. Housing Act applied to all public housing, including housing on Indian reservations. *See* 42 U.S.C. § 1437a(6)-(7) (1976) (defining "public housing agency" to include entities "authorized" by, among other governmental agencies, "Indian tribes" to "engage in or assist in the development or operation of low-income housing").

Through the Housing Act, Congress appropriated money for low-income housing purposes, *see* 42 U.S.C. § 1437g(c), and authorized and directed the Secretary of HUD to award, or lend, any appropriated funds to eligible grantees, *see* 42 U.S.C. §§ 1437b, 1437c, 1437f, 1437g(a), & 1439(d). Local housing authorities could apply for loans and grants for the "development, acquisition, or operation of low-income housing projects." *See* 42 U.S.C. §§ 1437b, 1437c, 1437d(a), 1437g. Under the Housing Act, HUD could award funding and other benefits to tribal housing authorities. *See, e.g.*, 24 C.F.R. §§ 805.108-805.109 (1976) (relating to Indian housing authorities).

HUD implemented, by regulation, a "Mutual Help Home-ownership Opportunity Program" on Indian lands to help meet the needs of low-income Indian families. The homes currently at issue were built under this regulatory program. Housing authorities could sell public housing to low-income families under "such terms and conditions as [HUD] may determine by regulation." 42 U.S.C. § 1437c(h) (1976). Under the Homeownership Program, an Indian housing authority could apply to HUD for loans to enable the housing authority to develop public housing designed for sale to eligible tribal members. *See* 24 C.F.R. §§ 805.404(a), 805.415, 805.416, 805.421, 805.422 (1976).

In 1988, nearly ten years after the Blackfeet low-income homes were completed, Congress enacted the Indian Housing Act. The Indian Housing Act was specific Indian housing legislation that moved all Indian public housing programs to a separate title of the U.S. Housing Act and provided express statutory authority for the Homeownership Program under 42 U.S.C. § 1437bb (1988). With the subsequent adoption of the NAHASDA in 1996, Congress moved Indian housing programs out of the U.S. Housing Act consolidating the programs under NAHASDA. HUD's involvement with Indian public housing programs is now controlled exclusively by the NAHASDA and its implementing regulations. Housing Authorities receive block grants under the NAHASDA, and HUD administers the grants. *See Solomon v. Interior Reg'l Hous. Auth.*, 313 F.3d 1194, 1195 (2002).

On their face, these statutes only establish a mechanism for lending money to tribal housing authorities. However, a review of the statutory framework and the Homeownership Program reveals a much more pervasive and controlling framework, as detailed above. The Homeownership Program details the requirements for the housing and connected contracts. There is no language indicating that the goal of the Homeownership Program is merely to help Indian tribes in managing their land and resources. The regulations do not

defer to tribal authorities or tribal decision making, but instead explicitly detail what the tribal authorities are to do each step of the way. Federal control over the funds and the program is pervasive.

But pervasive control over a tribal housing program is not necessarily the same as federal control over the tribal resource. If the tribe chooses not to participate in this program (and therefore not receive the funding for housing), HUD has no input into the housing contracts, house designs, or materials used. Such a view, however, ignores the overarching housing issue. The federal government undertook, as part of its treaty and general trust relationship, to assist the Blackfeet tribe to acquire decent, safe, and sanitary housing for low-income families. The tribe had little choice but to accept the government housing program. HUD's Homeownership Program was the "only reasonable source of housing in many reservations," *see* H.R. Rep. 100-604, *reprinted in* 1988 U.S.C.C.A.N. 791, 795, and this was the case on the Blackfeet Reservation. Here, the federal government actively undertook to assist the Blackfeet to obtain desperately needed decent, safe, and sanitary housing. Labeling the housing program as simply one of "financing" ignores the fact that private lenders would not finance the construction of homes on reservation land held by the federal government, which actively undertook to assist the Blackfeet to obtain desperately needed decent, safe, and sanitary housing.

Because the government undertook to fulfill its trust responsibility to provide housing for the tribe and did so through a pervasive regulatory structure, I would hold that the federal government, having undertaken this task, had an obligation to perform it in a manner consistent with its fiduciary duty to the tribe. Based on the facts set forth in the Complaint, I believe that the government breached that duty by requiring the tribes to use substandard, hazardous building materials during the construction of the homes and then refusing to

repair or rebuild the homes. Accordingly, I concur in part, dissent in part.