788 F.2d 638
 UNITED STATES of America, ex rel. CHUNIE (Frances S.
Herrera), the Brotherhood of the Tomol, Inc., a
California corporation, and all Chumash
descendants similarly
situated,
Plaintiffs-
Appellants,
v.
Marie RINGROSE, Ilda McGuinness, Pier Gherini, Frances
Gherini, the Nature Conservancy, a District of Columbia
non-profit corporation, Santa Cruz Island Company, a
California corporation, Alexander Lennox Vail, James Vail
Wilkinson, Nathan Russell Vail, Margaret Vail Woolley, and
the Vickers Company, Ltd., a California Corporation; and
the State of California, Defendants-Appellees.
 No. 85-5508.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 5, 1985.
Decided April 29, 1986.
As Amended May 5, 1986.
 
 Mario Gonzalez, Sidney C. Flores, Flores, Luna & Barrios, San Jose, Cal., for plaintiffs-appellants.
 Jill S. Slater, Latham & Watkins, Robert Willett, O'Melveny & Myers, Los Angeles, Cal., Bruce S. Flushman, Deputy Atty. Gen., San Francisco, Cal., Gytis L. Nefas, Kazemzadeh, Jacobs & Nefas, Rosemead, Cal., Henry K. Workman, John Gherini, Francis Gherini, Sullivan, Workman & Dee, Los Angeles, Cal. for defendants-appellees.
 Appeal from the United States District Court for the Central District of California.
 Before FLETCHER, PREGERSON and CANBY, Circuit Judges.
 FLETCHER, Circuit Judge:
 
 
 1
 Plaintiff Chunie, Frances S. Herrera, a Chumash Indian, and plaintiff The Brotherhood of the Tomol, Inc., representing the coastal band of Chumash Indians in its governmental capacity, appeal the district court's dismissal of their claim for unlawful trespass and conversion of the Santa Barbara Islands and surrounding channel beds. The plaintiffs allege that they were never divested of their aboriginal Indian title to the islands. The individually named defendants and the three organizational defendants claim ownership of the islands. Defendant State of California claims title to the channel beds surrounding the islands. The district court granted the defendants' motion to dismiss, holding that the Chumash had failed to state a claim for which relief can be granted. We affirm the holding, although on grounds somewhat different from those relied upon by the district court.
 
 FACTS
 
 2
 Plaintiff Chunie, Frances S. Herrera, is a Chumash Indian. She alleges that from time immemorial, the Chumash people have occupied the Santa Barbara Islands, i.e., Santa Cruz and Santa Rosa Islands, and the surrounding channel beds. Plaintiff The Brotherhood of the Tomol, Inc. represents the coastal band of Chumash Indians in its governmental capacity. Plaintiffs are hereinafter referred to collectively as the Chumash.
 
 
 3
 Santa Cruz and Santa Rosa Islands are two of the channel islands lying off the Santa Barbara coast, each covering about 50,000 acres. Spain acquired the islands by conquest and colonization, and the islands passed to Mexico when it obtained its independence from Spain.
 
 
 4
 In the 1830's and 1840's, the Mexican government granted Santa Rosa Island to Antonio and Carlos Carrillo and granted Santa Cruz Island to Andres Castillero. The individual and organizational defendants claim title derived from that of the Carrillos and Castillero. The Chumash contend that the Mexican land grants did not extinguish aboriginal title and were made subject to the Indians' right of occupancy.
 
 
 5
 The Treaty of Guadalupe Hidalgo, signed on February 2, 1848 and entered into force on May 30, 1848, signaled the formal end of the Mexican-American War. 9 Stat. 922 (1848). Under the treaty, Mexico ceded California to the United States, art. V, 9 Stat. at 926, but the Chumash contend the islands were not included in the ceded area. Despite this contention, the Chumash argue that the treaty converted their aboriginal title into recognized title protected by the fifth amendment.
 
 
 6
 To settle land claims in the newly acquired territory, Congress passed the Act of March 3, 1851, ch. 41, 9 Stat. 631 (1851). The Act created a board of commissioners to determine the validity of claims, and required every person "claiming lands in California by virtue of any right or title derived from the Spanish or Mexican government" to present the claim within two years. Castillero, and the successor-in-interest to the Carrillos, presented claims which were upheld by the courts. See United States v. Castillero, 64 U.S. (23 How.) 464, 16 L.Ed. 498 (1860); Manuelo Carrillo de Jones v. United States (S.D.Cal., Dec.Term.1855) (unpublished). The Chumash argue that even if the islands were included in the ceded area, the Act of 1851 did not apply to Indian claims based on aboriginal title, and Indians were excepted from the land confirmation proceedings.
 
 
 7
 In addition to claiming an interest in Santa Cruz and Santa Rosa Islands, the Chumash also allege ownership of the surrounding channel beds. As with the islands, the Chumash contend they have occupied the channel beds from time immemorial, that their aboriginal title has never been extinguished, and that the state did not acquire title to the channel beds.
 
 
 8
 The Chumash instituted this suit in district court seeking declaratory relief, damages for trespass and conversion, injunctive relief, and attorney's fees. They named as defendants eight individuals and three organizations who claim interests in Santa Cruz and Santa Rosa Islands, and the State of California which claims ownership of the channel beds. On motions by the defendants, the district court held that the plaintiffs failed to state a claim for which relief can be granted, and dismissed the action. The Chumash filed a timely appeal. On the appeal, all parties request attorney's fees under 42 U.S.C. Sec. 1988.
 
 DISCUSSION
 
 9
 1. The Mexican government's grant of Santa Cruz and Santa Rosa Islands to private individuals did not extinguish the Indians' aboriginal title.
 
 
 10
 Indians' aboriginal title derives from their presence on the land before the arrival of white settlers. Tee-Hit-Ton Indians v. United States, 348 U.S. 272, 279, 75 S.Ct. 313, 317, 99 L.Ed. 314 (1955). After conquest by European powers, Indians were permitted to occupy territory over which they had previously exercised "sovereignty." This right is not an ownership right, but is rather a right of occupancy granted by the conquering sovereign, id., referred to as "original Indian title," "aboriginal Indian title," or simply "Indian title." Felix S. Cohen's Handbook of Federal Indian Law 487 (1982 ed.) [hereinafter cited as Cohen].[1] The right is therefore necessarily a creature of the conquering sovereign's law. Because the parties have offered no evidence or argument that the Spanish or Mexican law of aboriginal title differs from our own, we will assume that it does not. Aboriginal title entitles the tribes to full use and enjoyment of the surface and mineral estate, and to resources, such as timber, on the land. See id. at 491. Despite this right of occupancy, the conquering government acquires the exclusive right to extinguish Indian title. Johnson v. M'Intosh, 21 U.S. (8 Wheat.) 543, 587, 5 L.Ed. 681 (1823). Extinguishment of aboriginal title does not create a legal obligation to pay compensation to the Indians. Tee-Hit-Ton, 348 U.S. at 290-91, 75 S.Ct. at 322-23.
 
 
 11
 Under the principle of Johnson v. M'Intosh, Spain's discovery and conquest of the Californias conferred upon Spain the right as sovereign to extinguish the Indians' aboriginal title. When Mexico obtained its independence from Spain, Mexico acquired this right to extinguish aboriginal title. The first issue in the case at bar is whether Mexico's land grants to private individuals constituted such extinguishment.
 
 
 12
 The Supreme Court has held that "an extinguishment cannot be lightly implied in view of the avowed solicitude of the Federal Government for the welfare of its Indian wards." United States ex rel. Hualpai Indians v. Santa Fe Pacific Railroad Co., 314 U.S. 339, 354, 62 S.Ct. 248, 255, 86 L.Ed. 260 (1941). Although the Court in Santa Fe was referring to extinguishment by the United States government, the same caution may be applied in analyzing whether the Mexican government extinguished aboriginal title.
 
 
 13
 The methods available to extinguish aboriginal title have never been explicitly enumerated. The court in Johnson provided that extinguishment could be "either by purchase or by conquest." 21 U.S. (8 Wheat.) at 587. In Santa Fe, the court recognized the United States' right to extinguish Indian title "whether it be done by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise." 314 U.S. at 347, 62 S.Ct. at 252. A grant of Indian-occupied land by the government to an individual does not, however, constitute extinguishment.
 
 
 14
 In Johnson v. M'Intosh, the Supreme Court held that the European discoverers inherited the power to grant lands occupied by Indians. 21 U.S. (8 Wheat.) at 574. The Court recognized, however, that "[t]hese grants have been understood by all, to convey a title to the grantees, subject only to the Indian right of occupancy." Id. (emphasis added). Other cases have similarly recognized that land grants were valid to convey the fee, but that the grantee took title subject to the Indians' right of occupancy. Beecher v. Wetherby, 95 U.S. (5 Otto) 517, 525, 24 L.Ed. 440 (1877) ("The grantee, it is true, would take only the naked fee, and could not disturb the occupancy of the Indians...."); Clark v. Smith, 38 U.S. (13 Pet.) 195, 201 (1839), 10 L.Ed. 123. The same principle applies to land grants by foreign sovereigns. See Chouteau v. Molony, 57 U.S. (16 How.) 203, 239, 14 L.Ed. 905 (1853) (land grants by the Spanish governors were made subject to the rights of Indian occupancy).
 
 
 15
 Based on this rule reaffirmed repeatedly by the Supreme Court, the Mexican land grants to Castillero and the Carrillos did not effect an extinguishment of the Chumash's aboriginal title. In holding otherwise, the district court erred. Castillero and the Carrillos, and their successors-in-interest, took the islands subject to the Chumash's right of occupancy.
 
 
 16
 2. The Santa Barbara Islands were within the territory ceded by Mexico to the United States under the Treaty of Guadalupe Hidalgo.[2]
 
 
 17
 The Treaty of Guadalupe Hidalgo was signed on February 2, 1848 and entered into force on May 30, 1848. 9 Stat. 922, TS No. 207. Article V of the treaty defines the boundary line between the United States and Mexico. 9 Stat. at 926-28. The California coastal islands are not explicitly mentioned.
 
 
 18
 The absence of any specific reference in the treaty to the islands is explained by the fact that the treaty drafters were primarily concerned with the latitudinal boundary between the two countries. As one historian observed: "In the treaty, as a matter of fact, the territory ceded is not mentioned. The treaty is content to specify the boundary." Bowman, The Question of Sovereignty Over California's Off-Shore Islands, 31 Pac.Hist.Rev. 291, 295 (1962). After reviewing available evidence on the question, Bowman concludes: "The territorial consequences were well understood at the time.... Neither the United States nor Mexico has ever contested [the inclusion of the islands as part of California].... [T]here seems never to have been uncertainty of intent or understanding as to the side of the line on which they lay." Id. at 301.
 
 
 19
 Two maps are mentioned in the second paragraph of article V, with copies attached to the treaty. One map shows the islands and the other does not, but neither appears particularly helpful because the maps are included for specific, limited purposes. The Disturnell map (which includes the islands) is referred to for the specific purpose of identifying "the southern and western limits of New Mexico." 9 Stat. at 926. The Pantoja map (on which no islands are shown) clarifies the "limit separating Upper from Lower California" in the vicinity of San Diego. Id. at 927. Although each party argues strenuously in favor of the map supporting its position, neither map is conclusive.
 
 
 20
 The Supreme Court answered the question in 1978 in United States v. California, 436 U.S. 32, 98 S.Ct. 1662, 56 L.Ed.2d 94 (1978). At issue in that case was whether the federal government or the state had dominion over the submerged lands and waters within the Channel Islands National Monument. The national monument encompasses two large and many smaller islands in the same vicinity as the islands at issue in the case at bar. In its discussion, the Court stated: "Federal title to the islands can be traced to the 1848 Treaty of Guadalupe Hidalgo, 9 Stat. 922, by which Mexico ceded to the United States the islands lying off the coast of California, along with the adjacent mainland." Id. at 34 n. 3, 98 S.Ct. at 1663 n. 3.
 
 
 21
 The Chumash argue this statement is "mere obiter dictum," claiming that the question of inclusion of the islands within the ceded area was not before the court. Although apparently neither party in United States v. California argued that the islands had been excluded in the cession, the Court's statement is definitive. It is an integral link in the chain by which the Court held that California exercised dominion over the waters in the national monument. Had the islands not been ceded to the United States in 1848, the federal government would have had no authority to transfer to California dominion over the surrounding submerged lands and waters under the Submerged Lands Act. See id. at 37, 98 S.Ct. at 1664. The Supreme Court's statement in footnote 3 of the opinion is thus part of the Court's holding and resolves the question of the islands' inclusion in the ceded territory.
 
 
 22
 3. The Treaty of Guadalupe Hidalgo did not convert the Chumash's aboriginal title into recognized title.
 
 
 23
 Despite the Chumash's contention that the Santa Barbara Islands were not included in the territory ceded under the Treaty of Guadalupe Hidalgo, the Indians claim their title became recognized pursuant to articles VIII and IX of the treaty. The district court did not address this claim. Article VIII of the treaty provided that Mexicans "now established in territories previously belonging to Mexico, and which remain for the future within the limits of the United States" could elect either nation's citizenship, and if no election were made within one year, would become United States citizens. 9 Stat. at 929. Under Article IX, persons not choosing to remain Mexican citizens "shall ... be admitted ... to the enjoyment of all the rights of citizens of the United States, according to the principles of the constitution." Id. at 930. Without citing any relevant authority, the Chumash state in their opening brief: "Thus, the aboriginal title of the Chumash Indians to the Islands came to be recognized by Article VIII and IX of the 1848 Treaty of Guadalupe Hidalgo."
 
 
 24
 In their briefs, the defendants point out the inconsistencies of the Chumash's arguments that the treaty did not convey the islands from Mexico to the United States, but that it nevertheless did confer citizenship and property rights on the Chumash. The Chumash explain in their reply brief that this result is possible because "[the Chumash] regularly commuted between the mainland and Islands.... [T]he rights conferred by Article[s] VIII and IX [of the treaty] were applicable to them as people (and not through inclusion of the Islands in the cession area)." They again cite no authority in support of their position.
 
 
 25
 The Chumash's contention is novel and creative, but does not appear to have any merit. For Indian title to be recognized, "Congress, acting through a treaty or statute, ... must grant legal rights of permanent occupancy within a sufficiently defined territory.... There must be an intention to accord or recognize a legal interest in the land." Sac and Fox Tribe of Indians v. United States, 315 F.2d 896, 897, 161 Ct.Cl. 189, cert. denied, 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165 (1963). We conclude that the treaty did not convert the Chumash's aboriginal title into recognized title.
 
 
 26
 4. The Chumash lost all rights in the islands when they failed to present claims in the land confirmation proceedings undertaken pursuant to the Treaty of Guadalupe Hidalgo and the Act of 1851.
 
 
 27
 To protect property rights of former Mexican citizens in the newly-acquired territory and to settle land claims, Congress passed the Act of March 3, 1851, ch. 41, 9 Stat. 631. The Act created a board of three commissioners to determine the validity of land claims in California, and required "every person claiming lands in California by virtue of any right or title derived from the Spanish or Mexican government" to present his or her claim to the commissioners within two years. Id. Secs. 1, 8, 13. Appeals from the commissioners' decisions were permitted to the district court and, ultimately, to the Supreme Court. Id. Secs. 9, 10. Where a land claim was confirmed, a federal patent was issued. Id. Sec. 13. A patent was conclusive between the patentee and the United States, but not binding against the interests of third parties with superior title. Id. Sec. 15; Barker v. Harvey, 181 U.S. 481, 491, 21 S.Ct. 690, 694, 45 L.Ed. 963 (1901) (citing Beard v. Federy, 70 U.S. (3 Wall.) 478, 492-93, 18 L.Ed. 88 (1866) ). Any land not claimed within two years, and any land for which a claim was finally rejected, was deemed "part of the public domain of the United States." Act of 1851, ch. 41, Sec. 13.
 
 
 28
 The purpose of the Act of 1851 was "to authenticate titles, and to afford the solid guarantee to rights which ensues from their full acknowledgment by the supreme authority." United States v. Fossatt, 62 U.S. (21 How.) 445, 448, 16 L.Ed. 185, 186 (1859). The goal was "to place the titles to land in California upon a stable foundation, and to give the parties who possess them an opportunity of placing them on the records of the country, in a manner and form that will prevent future controversy." Fremont v. United States, 58 U.S. (17 How.) 542, 553-54, 15 L.Ed. 241 (1855); accord Thompson v. Los Angeles Farming and Milling Co., 180 U.S. 72, 77, 21 S.Ct. 289, 291 (1901).
 
 
 29
 The land grants made by the Mexican government to Castillero and the Carrillos were confirmed under the provisions of the Act of 1851. United States v. Castillero, 64 U.S. (23 How.) 464, 16 L.Ed. 498 (1860); Manuelo Carrillo de Jones v. United States, (S.D.Cal., Dec.Term 1855) (unpublished). The Chumash did not file any claims under the Act. The Chumash contend, however, that the confirmation of the Mexican grants did not extinguish their aboriginal title because Indians claiming aboriginal rights were not required to file claims under the Act of 1851. The Act required persons claiming lands "by virtue of any right or title derived from the Spanish or Mexican government" to file claims. Because aboriginal title is not "derived from the Spanish or Mexican government," the Chumash argue that they were not required to file.
 
 
 30
 In several cases, the Supreme Court has addressed the issue of whether Indians were required to file claims under the Act of 1851. In Barker v. Harvey, 181 U.S. 481, 21 S.Ct. 690, 45 L.Ed. 963 (1901), mission Indians claimed a right of permanent occupancy of lands for which the plaintiffs held confirmed patents. The Court held that the Indians lost any rights they might have had by not presenting claims to the commissioners under the Act of 1851. Id. at 491-92, 21 S.Ct. at 694-95. The precise basis for this holding is not clear. As "mission Indians," the defendants apparently claimed a right of occupancy derived from the Mexican government; in addition, one of the land grants included an express condition that the grantee "not molest the Indians that thereon may be established." See id. at 482, 493, 21 S.Ct. at 690, 695. Either of these facts would support the Court's holding on the basis that the Indians' rights were "derived from the Mexican government" and thus subject to the filing requirement of the Act of 1851. The Court also concluded that the Indians had abandoned the lands prior to the cession and therefore had no valid right of occupancy. Id. at 499, 21 S.Ct. at 697. This finding would likewise support the Court's holding adverse to the Indians.
 
 
 31
 Twenty-three years later the Court reaffirmed the Barker decision in United States v. Title Insurance and Trust Co., 265 U.S. 472, 44 S.Ct. 621, 68 L.Ed. 1110 (1924). In Title Insurance, mission Indians claimed a "perpetual right" to occupy land which the Mexican government had granted and for which a confirmed patent had been issued. Id. at 481, 44 S.Ct. at 621. The Court followed its decision in Barker and held that the Indians' claim was lost by the failure to present it to the commission. Id. at 485-86, 44 S.Ct. at 623. Although not entirely clear in the opinion, the Court in a later decision observed that the Indians in Title Insurance "claimed an aboriginal right of occupancy." See Summa Corp. v. California ex rel. State Lands Commission, 466 U.S. 198, 208, 104 S.Ct. 1751, 1757, 80 L.Ed.2d 237 (1984).
 
 
 32
 This same principle was applied to non-mission Indians in Super v. Work, 3 F.2d 90 (D.C.Cir.1925), aff'd per curiam, 271 U.S. 643, 46 S.Ct. 481, 70 L.Ed. 1128 (1926). The Court of Appeals observed that Barker and Title Insurance involved mission Indians while Super concerned "Indians [who] were merely roving bands," 3 F.2d at 91, but found the distinction irrelevant. The Supreme Court summarily affirmed, citing Barker and Title Insurance as authority. 271 U.S. 643, 46 S.Ct. 481, 70 L.Ed. 1128.
 
 
 33
 In 1984, the Court addressed the State of California's obligation under the Act of 1851 to present land claims to the commission. Summa Corp. v. California ex rel. State Lands Commission, 466 U.S. 198, 104 S.Ct. 1751, 80 L.Ed.2d 237 (1984). In dispute were tidelands to which Summa held a confirmed patent derived from a Mexican land grant. California claimed it had acquired an interest in the tidelands upon its admission to the union, and contended that this sovereign right survived the land confirmation proceedings. Citing Barker and Title Insurance, the Court held that California's claim must have been presented in the patent proceedings or be barred. Id. at 209, 104 S.Ct. at 1758. Although the Court in Summa did not have before it the question of whether Indians were required to file claims, the far-reaching holding evidences the Court's conclusion that the land confirmation proceedings were intended to be all-encompassing.
 
 
 34
 The Chumash rely primarily on the case of Cramer v. United States, 261 U.S. 219, 43 S.Ct. 342, 67 L.Ed. 622 (1923). Cramer involved lands which the Indians had allegedly "occupied ... continuously since before 1859," and which had been granted to the defendant's predecessor pursuant to an 1866 statute. Id. at 225, 43 S.Ct. at 343. The Court distinguished Barker as a case involving "Mission Indians, claiming a right of occupancy derived from the Mexican Government," and concluded that "[t]he Indians here concerned have no such claim and are not shown to be within the terms of the Act of 1851 in any respect." Id. at 231, 43 S.Ct. at 345. Although the Chumash cite Cramer in support of their position, their reasoning fails. The Cramer court observed that the Indians in the case before it did not derive their claims from the Spanish or Mexican governments, and that there was no showing that they had occupied the land as early as 1848, when the Treaty was signed, or 1851, when the land confirmation act was enacted. Id. These facts explain the court's remark that the Cramer Indians "are not shown to be within the terms of the Act of 1851 in any respect." The Chumash, unlike the Cramer Indians, do derive their claim from a right of occupancy existing under Spanish or Mexican law, and their right existed well before 1848.
 
 
 35
 Given the line of Supreme Court decisions recognizing the extensive reach of the Act of 1851, we conclude that the district court correctly held that the Chumash, claiming a right of occupancy based on aboriginal title, lost all rights in the land when they failed to present a claim to the commissioners. When Andres Castillero and Manuelo Carrillo de Jones filed claims with the commissioners based on their land grants from the Mexican government, and had their titles confirmed and received federal patents to their lands, they were entitled to believe that adverse claims to their lands had been eliminated. This result comports with the overriding purpose of the Act of 1851 "to place the titles to land in California upon a stable foundation ... in a manner and form that will prevent future controversy." Fremont v. United States, 58 U.S. (17. How.) 542, 553-54, 15 L.Ed. 241 (1855).
 
 
 36
 5. The Chumash do not possess any interest in the channel beds surrounding Santa Cruz and Santa Rosa Islands.
 
 
 37
 In addition to claiming rights in Santa Cruz and Santa Rosa Islands, the Chumash also claim rights in the surrounding tidelands and submerged lands--the channel beds.[3] They allege that the State of California has unlawfully trespassed on the channel beds, has unlawfully leased the right to take minerals therefrom, and has converted the proceeds to its own use.
 
 
 38
 The Supreme Court has held that claims to tidelands and submerged lands were cognizable under the Act of 1851. See Summa, 466 U.S. at 205, 104 S.Ct. at 1754; United States v. Coronado Beach Co., 255 U.S. 472, 487-88, 41 S.Ct. 378, 381, 65 L.Ed. 736 (1921). Thus, by failing to present a claim to the commissioners, the Chumash lost all rights in the channel beds as well as in the islands themselves.[4]
 
 
 39
 6. Principles of international law do not provide additional support for the Chumash's claims.
 
 
 40
 In addition to basing their claims on the United States Constitution, federal statutes and regulations, and the Treaty of Guadalupe Hidalgo, the Chumash state that their case arises under "international law relating to the construction of treaties, determination of boundaries, and state succession, as incorporated by federal common law." In their briefs, the Chumash cite a variety of international law authorities including the Charter of the United Nations; the International Bill of Human Rights consisting of the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights, and the International Covenant on Economic, Social, and Cultural Rights; the American Convention on Human Rights; the American Declaration of Rights and Duties of Man; and the Vienna Convention on the Law of Treaties.
 
 
 41
 Based on our conclusion that the Chumash lost any rights in the islands by not filing claims under the Act of 1851, we need not address these additional arguments. In Barker v. Harvey, 181 U.S. 481, 21 S.Ct. 690, 45 L.Ed. 963 (1901), in which the Court held that mission Indians lost their rights by not presenting claims to the commissioners, the Court mentioned the role of international law:
 
 
 42
 Undoubtedly by the rules of international law, and in accordance with the provisions of the treaty between the Mexican government and this country, the United States were bound to respect the rights of private property in the ceded territory. But such obligation is entirely consistent with the right of this Government to provide reasonable means for determining the validity of all titles within the ceded territory, to require all persons having claims to lands to present them for recognition, and to decree that all claims which are not thus presented shall be considered abandoned.
 
 
 43
 Id. at 486-87, 21 S.Ct. at 692. The Supreme Court thus concluded that the requirements imposed by the Act of 1851 were consistent with rules of international law. Furthermore, all the international law authorities cited by the Chumash were adopted since 1945, and therefore cannot logically affect the operation of the Act of 1851. Principles of international law do not warrant changes in any of the foregoing analysis.
 
 
 44
 7. The defendants are not entitled to an award of attorney's fees on this appeal.
 
 
 45
 All parties seek attorney's fees on appeal under 42 U.S.C. Sec. 1988. Although attorney's fees may be awarded at the appellate as well as the trial level, Sotomura v. County of Hawaii, 679 F.2d 152 (9th Cir.1982), a prevailing defendant is entitled to an award of fees only where the plaintiff's action was "frivolous, unreasonable, or without foundation." Hughes v. Rowe, 449 U.S. 5, 14, 101 S.Ct. 173, 178, 66 L.Ed.2d 163 (1980) (quoting Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978) ); Jensen v. Stangel, 762 F.2d 815, 817 (9th Cir.1985). The Chumash raise issues not previously addressed by the courts, and their case cannot be characterized as frivolous or unreasonable. We therefore deny all requests for attorney's fees.
 
 
 46
 AFFIRMED.
 
 
 
 [1]
 Aboriginal Indian title differs from recognized Indian title. Recognized title exists where Congress by treaty or other agreement has declared that the Indians are to hold the lands permanently. Tee-Hit-Ton, 348 U.S. at 277-78, 75 S.Ct. at 316-17; Cohen, supra, at 486
 
 
 [2]
 The Chumash contend that the islands were not within the ceded area, and argue that on a motion to dismiss, the district court was obligated to accept this allegation as true. While the court generally must assume factual allegations to be true, it need not assume the truth of legal conclusions cast in the form of factual allegations. See Western Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir.), cert. denied, 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981); United States v. Tulare Lake Canal Co., 535 F.2d 1093, 1097 (9th Cir.1976), cert. denied, 429 U.S. 1121, 97 S.Ct. 1156, 51 L.Ed.2d 571 (1977). The interpretation of a treaty is a question of law and not a matter of fact. Strong v. United States, 518 F.2d 556, 563 (Ct.Cl.), cert. denied, 423 U.S. 1015, 96 S.Ct. 448, 46 L.Ed.2d 386 (1975). In light of the Supreme Court's statement in United States v. California, discussed infra, this issue is settled as a matter of law
 
 
 [3]
 The Chumash in their complaint allege title to Santa Cruz and Santa Rosa Islands "and surrounding channel beds," but do not define "surrounding channel beds." The State of California in its brief states: "For purposes of this brief, California assumes that [the term 'surrounding channel beds'] mean[s] the tidelands underlying the Pacific Ocean within three geographical miles seaward from the coastline of Santa Cruz and Santa Rosa Islands." Because the Chumash do not refute this assumption in their reply brief, we accept this assumption. The terms "channel beds," "tidelands," and "submerged lands" are used interchangeably by the parties and in this opinion
 
 
 [4]
 The parties present a variety of arguments on this issue based on other statutory and case authority, including the equal footing doctrine, the Submerged Lands Act, the Indian Non-Intercourse Act, the Northwest Ordinance of 1787, the 1928 Jurisdictional Act and the Indians of California cases in the Court of Claims, and the Indian Claims Commission Act and the case of Thompson v. United States brought as a representative action on behalf of the "Indians of California." Because the authorities discussed above dispose of this issue, we need not consider these additional arguments