Opinion by
Judge GRABER;
Dissent by Judge PREGERSON.
ORDER AND AMENDED OPINION
ORDER
The opinion filed on July 21, 2006, slip op. 8071, and appearing at 455 F.3d 974 (9th Cir.2006), is replaced in part and adopted in part, and the amended opinion filed on March 19, 2008, slip op. 2545, and appearing at 519 F.3d 838, is replaced in its entirety by the amended opinion filed concurrently with this order.
With this amended opinion, Judges Gra-ber and Gould have voted to deny the Petition of the Federal Appellees for Panel Rehearing and Blackfeet Housing’s Peti *919 tion for Rehearing En banc. Judge Pre-gerson has voted to grant the petitions.
The full court has been advised of the petition for rehearing en banc and no judge of the court has requested a vote on it.
The petition for panel rehearing and the petition for rehearing en banc are DENIED. No further petitions for panel rehearing or petitions for rehearing en banc may be filed.
OPINION
GRABER, Circuit Judge:
Plaintiffs are members of the Blackfeet Indian Tribe who bought or leased houses built under the auspices of the United States Department of Housing and Urban Development (“HUD”). The houses had wooden foundations. The wood had been pressure-treated with toxic chemicals. Plaintiffs allege that the use of wooden foundations caused their houses to deteriorate and that the chemicals in the wood have caused, and continue to cause, health problems for those who live in the houses. On behalf of a class of persons similarly situated, Plaintiffs sued HUD, the Secretary of HUD, the Blackfeet Tribal Housing Authority and its board members (“the Housing Authority”) under several theories. The district court dismissed the entire complaint under Federal Rule of Civil Procedure 12(b)(6).
On rehearing, we hold: (1) Plaintiffs must exhaust their tribal court remedies before bringing their claim against the Housing Authority; (2) the government did not undertake a trust responsibility toward Plaintiffs to construct houses or maintain or repair houses; and (3) Plaintiffs alleged sufficient facts to state claims against HUD under the Administrative Procedure Act (“APA”). We readopt our earlier opinion[1] with respect to Plaintiffs breach of contract claims. Accordingly, we affirm the district court’s dismissal of the case except as to Plaintiffs’ claims against the Housing Authority and its board members and Plaintiffs’ claims under the APA. As to those claims, we reverse and remand for further proceedings.
FACTUAL AND PROCEDURAL BACKGROUND
Because the district court dismissed the complaint for failure to state a claim, we construe the facts from Plaintiffs’ complaint, which we must deem to be true, in the light most favorable to them. Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337-38 (9th Cir.1996). But we “need not assume the truth of legal conclusions cast in the form of factual allegations.” United States ex rel. Chunie v. Ringrose, 788 F.2d 638, 643 n. 2 (9th Cir.1986).
The Blackfeet Tribe is a federally recognized Indian tribe. In January 1977, the Tribe established a separate entity, the Blackfeet Housing Authority. See 24 C.F.R. § 805.109(c) (1977) (requiring, as a prerequisite to receiving a block grant from HUD, that a tribe form a HUD-approved tribal housing authority). The Blackfeet Tribe adopted HUD’s model enabling ordinance. Blackfeet Tribal Ordinance No. 7, art. II, §§ 1-2 (Jan. 4, 1977), reprinted in 24 C.F.R. § 805, subpt. A, app. I (1977). Thereafter, HUD granted the Blackfeet Housing Authority authorization and funding to build 153 houses.
Construction of those houses, and some additional ones, began after the Housing Authority came into being in 1977. Construction was completed by 1980.[2] The *920 houses—at least in retrospect—were not well constructed. They had wooden foundations, and the wood products used in the foundations were pressure-treated with toxic chemicals. The crux of. Plaintiffs’ complaint is that HUD directed the use of pressure-treated wooden foundations, over the objection of tribal members, and that the Housing Authority aeceded to that directive.
In the ensuing years, the foundations became vulnerable to the accumulation of moisture, including both groundwater and septic flooding, and to structural instability. Some of the houses have become uninhabitable due to contamination from toxic mold and dried sewage residues. The residents of the houses have experienced health problems, including frequent nosebleeds, hoarseness, headaches, malaise, asthma, kidney failure, and cancer.
Plaintiffs bought or leased the houses, either directly or indirectly, from the Housing Authority. After it became clear that the houses were unsafe or uninhabitable, Plaintiffs asked the Housing Authority and HUD to repair the existing houses, provide them with new houses, or pay them enough money to repair the houses or acquire substitute housing. When they received no help from either entity, Plaintiffs filed this class action against the Housing Authority, HUD, and the Secretary of HUD. Plaintiffs seek declaratory and injunctive relief and damages for alleged violations of statutory, contractual, and fiduciary duties.
HUD filed a motion to dismiss for lack of subject matter jurisdiction and a motion to dismiss for failure to state a claim upon which relief can be granted. The Housing Authority and its board members filed a motion to dismiss because of tribal immunity. The district court granted those motions.
In our original opinion, we affirmed the dismissal of HUD and its Secretary, but reversed with respect to the Housing Authority. Marceau v. Blackfeet Hous. Auth. (Marceau I), 455 F.3d 974 (9th Cir.2006). We granted the Housing Authority’s petition for rehearing and issued an amended opinion. Marceau v. Blackfeet Hous. Auth. (Marceau II), 519 F.3d 838 (9th Cir.2008). The Housing Authority and HUD filed separate petitions for review. We now issue this revised opinion.
STANDARD OF REVIEW
We review de novo each of the issues in this case. See Coyle v. P.T. Garuda Indon., 363 F.3d 979, 984 n. 7 (9th Cir.2004) (concerning federal subject matter jurisdiction); Atwood v. Fort Peck Tribal Court Assiniboine, 513 F.3d 943, 946 (9th Cir.2008) (concerning exhaustion of tribal court remedies).
DISCUSSION
A. Claim against the Housing Authority
Plaintiffs allege that the Blackfeet Housing Authority breached the covenants of habitability, merchantability, and good faith and fair dealing by selling defective homes to Plaintiffs. We decline to reach the merits of this contract claim because Plaintiffs first must exhaust their tribal court remedies.
Principles of comity require federal courts to dismiss or to abstain from deciding claims over which tribal court jurisdiction is “colorable,” provided that there is no evidence of bad faith or harassment. Atwood, 513 F.3d at 948. Exhaustion of tribal remedies is “mandatory.” Burlington N. R.R. Co. v. Crow Tribal Council, 940 F.2d 1239, 1245 (9th Cir.1991). The parties failed to raise this issue until after we issued our opinion. Nevertheless, “[a] district court has no discretion to relieve a litigant from the duty to exhaust tribal remedies prior to proceeding in federal court.” Allstate In- *921 dem. Co. v. Stump, 191 F.3d 1071, 1073 (9th Cir.), amended, 197 F.3d 1031 (9th Cir.1999). Although Plaintiffs’ contract claim has not yet been brought in tribal court, “[t]he absence of any ongoing litigation over the same matter in tribal courts does not defeat the tribal exhaustion requirement.” Sharber v. Spirit Mountain Gaming Inc., 343 F.3d 974, 976 (9th Cir.2003) (per curiam); see also United States v. Plainbull, 957 F.2d 724, 728 (9th Cir.1992) (holding that exhaustion of tribal remedies is “required even in the absence of a pending tribal court action”).
Tribal court jurisdiction over the contract disputes here is unquestionably col-orable: Plaintiffs are tribal members, Defendant Blackfeet Housing Authority is a tribal entity, and at least some key events—construction of the homes, for instance—occurred on tribal lands. See Stock W. Corp. v. Taylor, 964 F.2d 912, 919 (9th Cir.1992) (en banc) (holding that tribal court jurisdiction was colorable where a non-tribe member sued a tribe in a contract and tort dispute and the key events may have taken place on tribal lands). Because there is no evidence of bad faith or harassment, we hold that Plaintiffs must exhaust their tribal court remedies. Accordingly, we remand the case. Because of the lengthy course of this litigation, the district court should stay, rather than dismiss, the action against the Housing Authority while Plaintiffs exhaust their tribal court remedies. See Allstate Indem. Co., 191 F.3d at 1076 (remanding with instructions to stay action while party exhausted tribal court remedies). Cf. Atwood., 513 F.3d at 948 (approving a district court’s discretionary decision to dismiss a domestic relations action when tribal court proceedings were pending).
In our earlier opinions, we declined to require Plaintiffs to exhaust their tribal court remedies. Instead, we held that the Blackfeet Tribe had waived tribal immunity through the enabling ordinance that established the Housing Authority. Marceau II, 519 F.3d at 842-44; Marcean I, 455 F.3d at 978-83; see also Kiowa Tribe of Okla. v. Mfg. Techs., Inc., 523 U.S. 751, 754, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998) (noting that “an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity”). Our doing so was in error, and we now' vacate that holding and decline to reach the issue. Whether or not the Tribe waived tribal immunity, the tribal court must have the first opportunity to address all issues within its jurisdiction, including that one.
B. Claim of Federal Trust Responsibility
Plaintiffs allege that HUD violated its trust responsibility to them, as tribal members, “because of [HUD’s] comprehensive and pervasive control of the monies, the property, the standards for constructing the homes, the standards for providing mortgages for the homes, [and] the standards for who qualifies to live in the homes.” Plaintiffs further allege that “[t]he corpus of the trust agreement is found in the statutes” concerning Indian housing. Before examining those statutes, we will set out some governing principles for interpreting them.
1. Governing Principles
In general, a trust relationship exists between the United States and Indian Nations. Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1831). But that relationship does not always translate into a cause of action.[3] In a pair of cases *922 from the 1980s, the Supreme Court gave us guidance to determine when an actionable fiduciary duty toward Indians arises.
In Mitchell I, 445 U.S. at 541-46, 100 S.Ct. 1349, tribal members on the Quinault Indian Reservation protested federal mismanagement of the tribe’s timber resources. Although acknowledging that the Indian General Allotment Act of 1887 (“General Allotment Act”), ch. 119, 24 Stat. 388, 25 U.S.C. §§ 331-358 (1976) (§§ 331-333 repealed by Pub.L. No. 106-462, § 106(a)(1) (2000)), established a trust relationship on behalf of Indians, the Court found that the relationship was “limited” and did not impose on the government a particular duty to manage timber resources. Mitchell I, 445 U.S. at 542, 100 S.Ct. 1349. Instead, the federal government’s trust responsibilities under the General Allotment Act were merely to prevent alienation of the land and to hold the land “immune from ... state taxation.” id. at 544, 100 S.Ct. 1349. Despite rejecting the tribe’s claim under the General Allotment Act, the Court remanded the case to the Court of Claims to consider whether other statutes might provide a basis for liability. Id. at 546, 100 S.Ct. 1349.
When the case returned to it, the Supreme Court permitted a claim to proceed. Mitchell 11, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580. The Court examined various timber management statutes that Congress had enacted after the General Allotment Act. Id. at 219-23, 103 S.Ct. 2961. Those statutes directed the government to manage Indian forest resources, obtain revenue thereby, and pay proceeds to the Indian landowners. Id. The Court held that those statutes imposed strict and detailed duties on the government to manage forest lands. Id. at 224-25, 103 S.Ct. 2961. In view of the pervasive and complete control exercised by the government over the lands, the statutes confirmed the existence of a fiduciary relationship. Id. Thus, the statutes satisfied the requirements for a claim of breach of fiduciary duty because they mandated the payment to Indians of money resulting from the management of Indian timber resources. Id. at 224-27, 103 S.Ct. 2961.
Together, Mitchell I and Mitchell II form the Mitchell doctrine: To create an actionable fiduciary duty of the federal government toward Indian tribes, a statute must give the government pervasive control over the resource at issue. Two 2003 Supreme Court decisions illustrate how the Mitchell doctrine applies: United States v. Navajo Nation, 537 U.S. 488, 123 S.Ct. 1079, 155 L.Ed.2d 60 (2003), and United States v. White Mountain Apache Tribe, 537 U.S. 465, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003).
We first address Navajo Nation. In 1964, the Navajo Nation—with approval from the Secretary of the Interior—entered into a lease with the corporate predecessor of the Peabody Coal Company for the mining of coal on tribal lands. 537 U.S. at 493, 123 S.Ct. 1079. The lease provided for low royalty payments to the tribe. Id. at 495, 123 S.Ct. 1079. Under the terms of the lease, the tribe and the mining company agreed to delegate power to the Secretary of the Interior to adjust the royalty rate to a “reasonable” level on the twentieth anniversary of the lease. Id. By the 1980s, the royalties to the Navajo Nation equaled only about 2% of gross *923 proceeds of the coal, while Congress had established a yield of 12.5% for coal mined on federal lands. Id. at 495-96, 123 S.Ct. 1079.
Eventually, the Navajo Nation and Peabody negotiated a change in the royalty rate to 12.5%, retroactive to 1984. Id. at 498, 123 S.Ct. 1079. The agreement also included other concessions by Peabody, including acceptance of tribal taxation of coal production. Id. at 498-99, 123 S.Ct. 1079. In 1987, after the Navajo Tribal Council approved amendments to the lease and a final agreement was signed, the Secretary of the Interior approved the agreement. Id. at 500, 123 S.Ct. 1079.
The tribe later learned that the Secretary had engaged in ex parte dealings with Peabody, without which, they alleged, the rate could have been as high as 20%. The Navajo Nation filed suit in the Court of Federal Claims, claiming that the Secretary of the Interior had breached the government’s trust obligations by approving the 1987 amendments to the lease. Id. at 500, 123 S.Ct. 1079. The tribe contended that the Indian Mineral Leasing Act of 1938 (“Indian Mineral Leasing Act”), ch. 198, 52 Stat. 347, 25 U.S.C. §§ 396a-496g, imposed a fiduciary obligation on the Secretary of the Interior to maximize financial returns from coal leases on Indian lands and that the royalty approved in 1987 was inadequate. Navajo Nation, 537 U.S. at 493, 123 S.Ct. 1079.
When the case reached the Supreme Court, the Court confirmed the primacy of Mitchell I and Mitchell II as “the path-marking precedents on the question whether a statute or regulation (or combination thereof) ‘can fairly be interpreted as mandating compensation by the Federal Government.’ ” Navajo Nation, 537 U.S. at 503, 123 S.Ct. 1079 (quoting Mitchell II, 463 U.S. at 218, 103 S.Ct. 2961). The Court explained the contrast between Mitchell I and Mitchell II as the difference between a “ ‘bare trust’ ” for a limited purpose and “ ‘full responsibility’ ” for management of Indian resources. Id. at 505, 123 S.Ct. 1079 (quoting Mitchell II, 463 U.S. at 224, 103 S.Ct. 2961). The Court held that a court’s analysis of a statute “must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions.” Id. at 506, 123 S.Ct. 1079.
Turning to the Indian Mineral Leasing Act, the Court held that the statute failed to establish even the “limited trust relationship,” which the Court found insufficient to support a claim for relief in Mitchell I, because the statute did not include any trust language. Id. at 507-08, 123 S.Ct. 1079. Instead, the statute “simply requirefd] Secretarial approval before coal mining leases negotiated between Tribes and third parties become effective and authorized] the Secretary generally to promulgate regulations governing mining operations.” Id. at 507, 123 S.Ct. 1079 (citations omitted). Further, because the Indian Mineral Leasing Act “aim[ed] to enhance tribal self-determination by giving Tribes, not the Government, the lead role in negotiating mining leases with third parties,” the congressional purpose would be defeated by “[ijmposing upon the Government a fiduciary duty to oversee the management of allotted lands.” Id. at 508, 123 S.Ct. 1079.
On the same day as it issued Navajo Nation, the Supreme Court examined the trust doctrine in the context of overseeing the maintenance of buildings on land of the White Mountain Apache Tribe, White Mountain Apache Tribe, 537 U.S. 465, 123 S.Ct. 1126, 155 L.Ed.2d 40. In 1870, the United States Army established Fort Apache in the White Mountains of Arizona. Id. at 468, 123 S.Ct. 1126. In the 1920s, control of the fort was transferred to the Department of the Interior, which used *924 part of the property as a school. Id. at 468-69, 123 S.Ct. 1126. In 1960, Congress declared that Fort Apache be “ ‘held by the United States in trust for the White Mountain Apache Tribe, subject to the right of the Secretary of the Interior to use any part of the land and improvements for administrative or school purposes for as long as they are needed for the purpose.’ ” Id. at 469, 123 S.Ct. 1126 (quoting Pub.L. No. 86-392, 74 Stat. 8, 8 (1960 Act)). In 1976, the National Park Service designated Fort Apache as a National Historic Site. Id.
The tribe brought suit, alleging that the Secretary of the Interior exercised the statutory prerogative to use the property, but then failed to perform necessary maintenance and allowed Fort Apache to fall into disrepair. White Mountain Apache Tribe v. United States, 46 Fed.Cl. 20, 22 (1999). An engineering assessment estimated that rehabilitating the property in accordance with standards for historic preservation would cost $14 million. White Mountain Apache Tribe, 537 U.S. at 469, 123 S.Ct. 1126.
The Supreme Court held that an actionable fiduciary relationship existed between the federal government and the tribe. Id. at 468, 123 S.Ct. 1126. The Court explained that a trust relationship alone is not enough to imply a remedy in damages; “a further source of law [is] needed to provide focus for the trust relationship.” Id. at 477, 123 S.Ct. 1126. In the case of the White Mountain Apache Tribe, that further source of law was the 1960 Fort Apache statute, which went “beyond a bare trust and permitted] a fair inference that the Government [was] subject to duties as a trustee and liable in damages for breach.” Id. at 474, 123 S.Ct. 1126. First, the 1960 Act “expressly define[d] a fiduciary relationship” by providing that Fort Apache was “ ‘held by the United States in trust for the White Mountain Apache Tribe.’ ” Id. (quoting 74 Stat. at 8) (emphasis added). Second, the United States exercised its discretionary authority under the statute to make actual use of the property, “not merely exercis[ing] daily supervision but ... enjoyfing] daily occupation.” Id. at 475, 123 S.Ct. 1126. Because the government assumed plenary control over the assets held in trust, the government likewise assumed an obligation, as trustee, to preserve those assets. Id.

2. Housing on the Blackfeet Reservation

To decide whether Plaintiffs have a viable claim for violation of a federal trust responsibility, we must examine the statutes and regulations pertaining to the Blackfeet houses at issue. After having-done so, we conclude that HUD did not undertake a trust responsibility toward Plaintiffs to construct houses or to maintain or repair houses.
During the period in which the houses were constructed, between 1977 and 1980, HUD provided federal funds to the Blackfeet Housing Authority pursuant to the United States Housing Act of 1937, 42 U.S.C. § 1437 (1976). Under that statute and its implementing regulations for Indian housing, a tribe could establish an Indian housing authority. 24 C.F.R. §§ 805.108, 805.109 (1977). In “Annual Contributions Contracts,” HUD agreed to provide a specified amount of money to fund projects undertaken by an Indian housing authority and approved by HUD. Id. §§ 805.102, 805.206. After securing funding from HUD, an Indian housing authority contracted with eligible American Indian families. Id. § 805.406. Eligible families contributed land, labor, or materials to the building of their houses. Id. § 805.408. After occupying its house, each family made monthly payments to the housing authority in an amount calibrated *925 to the family’s income. Id. § 805.416(a)(l)(ii). The Indian purchasers were responsible for maintaining their houses. Id. § 805.418(a).
The express intent of Congress was “to vest in local public housing agencies the maximum amount of responsibility in the administration of their housing programs.” 42 U.S.C. § 1437 (1976). In other words, Congress specifically intended that HUD not assume more responsibility in developing and managing housing projects than was necessary. HUD was not without legal obligations, however. Congress also provided:
The Department of Housing and Urban Development ... shall exercise their powers, functions, and duties under this or any other law, consistently with the national housing policy declared by this Act and in such manner as will facilitate sustained progress in attaining the national housing objective hereby established, and in such manner as will encourage and assist (1) the production of housing of sound standards of design, construction, livability, and size for adequate family life; (2) the reduction of the costs of housing without sacrifice of such sound standards; (3) the use of new designs, materials, techniques, and methods in residential construction, the use of standardized dimensions and methods of assembly of home-building materials and equipment, and the increase of efficiency in residential construction and maintenance; (4) the development of well-planned, integrated, residential neighborhoods and the development and redevelopment of communities; and (5) the stabilization of the housing industry at a high annual volume of residential construction.
42 U.S.C. § 1441. As we and our sister circuits have recognized, those goals create binding legal obligations on HUD. Russell v. Landrieu, 621 F.2d 1037, 1041 (9th Cir. 1980); United States v. Wintkrop Towers, 628 F.2d 1028, 1034-36 (7th Cir.1980); Pennsylvania v. Lynn, 501 F.2d 848, 855 (D.C.Cir.1974); see also Shannon v. U.S. Dep’t of Hous. & Urban Dev., 436 F.2d 809, 819-20 (3d Cir.1970) (holding that plaintiff residents of HUD-administered homes could bring suit under the APA to challenge HUD actions allegedly not in accoi’dance with the Housing Act). Those obligations apply to all HUD housing, however, and not just to housing constructed by Indian housing authorities.
Under its regulations, HUD had two general controls over Indian housing. First, HUD required that low-income housing meet Minimum Property Standards, 24 C.F.R. §§ 200.929, 805.212 (1977). Second, new construction could not exceed the “prototype costs” (HUD-approved ceiling or maximum costs for each type of dwelling) for a project, although the prototype costs could be revised upon request of a housing authority, either at application for a project or later when found to be necessary. 24 C.F.R. §§ 805.213(c), 805.214(b), 841.204 (1977).
Three important points bear emphasis. First, neither restriction was unique to Indian housing. Title 24 C.F.R. § 200.925 (1977) provided that all housing built under HUD programs, and not just housing built by Indian housing authorities, “shall meet or exceed HUD Minimum Property Standards.” See, e.g., 24 C.F.R. § 800.205(c)(1) (1977) (mandating that developers provide “detailed information” concerning the application of the Minimum Property Standards in their project applications); 24 C.F.R. § 841.107(c)(2) (1977) (requiring use of the Minimum Property Standards in other HUD-funded construction projects). Similarly, non-Indian housing construction projects had to comply with prototype cost limitations. See, e.g., 24 C.F.R. §§ 841.115(b)(2), pt. 841, app. A *926 (1977) (establishing limitations on dwelling construction and equipment costs based on the area prototype costs).
Second, HUD regulations did not require the use of pressure-treated wooden foundations. With respect to foundations, HUD’s Minimum Property Standards provided two alternative sets of minimum requirements, one for concrete or masonry walls below grade and one for pressure-treated wooden foundations. Dep’t of Hous. & Urban Dev., Handbook 4900.1: Minimum Property Standards for One and Two Family Dwellings § 601-16 & app. E (1973 ed., rev. May 1979) (“Minimum Property Standards Handbook ”).
Third, Indian housing authorities were not rigidly bound by either the Minimum Property Standards or the prototype cost limitations."[4] Indian housing authorities could choose to request variances from both the Minimum Property Standards and the prototype costs, if they believed that local conditions justified modifications. 24 C.F.R. §§ 805.212(a), 805.213(c) (1977). In a handbook published for use by Indian housing authorities, HUD characterized the introductory statements to the handbook on Minimum Property Standards as “stressing] the importance of flexibility to meet local conditions.” Dep’t of Hous. & Urban Dev., Handbook 7440.1: Interim Indian Housing Handbook § 3-5(a) (1976 ed., rev. Jan.1978) (“Indian Housing Handbook ”). As HUD emphasized:
The [Indian Housing Authority] is responsible for the planning and development of Indian housing projects. The U.S. Housing Act of 1937 provides that local public housing agencies are to be vested with maximum responsibility for project administration and the Indian Self-Determination and Education Assistance Act emphasizes the importance of maximum Indian self-determination.
Indian Housing Handbook § 2-1 (a).
Indeed, a 1979 amendment to the Indian housing regulations further emphasized the importance of maximizing Indian self-determination by removing the requirement that Indian housing comply with the HUD Minimum Property Standards in the absence of a waiver. Instead, the amendment required only that the design of Indian housing take into account the Minimum Property Standards, along with several other factors. 24 C.F.R. § 805.212(a) (1979). Thus, at the end of the period during which the housing in question was built, HUD was loosening, not tightening, the reins on the autonomy of Indian housing authorities that were receiving block grants.
By the time Plaintiffs filed their complaint in 2002, a new statutory regime was in effect under which Plaintiffs claim a federal trust obligation to repair or replace their houses.[5] In 1996, Congress enacted the Native American Housing Assistance *927 and Self-Determination Act of 1996 (“NA-HASDA”), 25 U.S.C. §§ 4101-4243. As the 1996 statute’s statement of congressional findings recognized, federal Indian housing assistance was to be provided “in a manner that recognizes the right of Indian self-determination and tribal self-governance” and with the “goals of economic self-sufficiency and self-determination for tribes and their members.” 25 U.S.C. § 4101(6)-(7).
Under NAHASDA, HUD makes annual block grants, in amounts determined by a formula, to a tribe or its designated housing entity (such as an Indian housing authority), to carry out activities related to the provision of affordable housing. 25 U.S.C. §§ 4111(a), 4152; 24 C.F.R. §§ 1000.201, 1000.202, 1000.206, 1000.301-.340. To receive a block grant, a tribe must submit to HUD an Indian Housing Plan that meets certain requirements and that is subject to HUD’s approval. 25 U.S.C. § 4111(b); 24 C.F.R. § 1000.201. But the housing plan is to be “locally driven.” 24 C.F.R. § 1000.220. And HUD’s statutorily prescribed role—in addition, of course, to providing the block grants themselves— is generally confined to “a limited review of each Indian housing plan,” and even then “only to the extent that [HUD] considers review is necessary.” 25 U.S.C. § 4113(a)(1). The grant, once made, is subject to tribal control; the recipient, rather than HUD, is responsible for operating the housing program, including the continued maintenance of housing. 25 U.S.C. § 4133. HUD’s responsibility consists primarily of oversight and audit, to ensure that federal funds are spent for the intended purpose. 24 C.F.R. § 1000.520.
Ultimately, no statute ever required tribes to form housing authorities. No statute obliged Indian housing authorities, once formed, to seek federal funds. No statute committed the United States itself to construct houses on Indian lands or to manage or repair them. Indeed, the relevant regulations expressly imposed inspection duties on Indian housing authorities, independently of HUD, including any enforcement of warranties. 24 C.F.R. §§ 805.221(a), 805.417(a) (1977).
No statute has imposed duties on the government to manage or maintain the property, as occurred in Mitchell II, nor has any HUD regulation done so. Unlike in White Mountain Apache Tribe, here no statute has declared that any of the property was to be held by the United States in trust, nor did the United States occupy or use any of the property. In the present case, there is plenary control of neither the money nor the property.
Instead, this case most closely resembles Navajo Nation, Just as the Indian Mineral Leasing Act required Secretarial approval of leases, but did not oblige the Secretary to negotiate them, the United States Housing Act gave HUD a right of final inspection with respect to construction and design materials, 24 C.F.R. §§ 805.211-805.217 (1977), but did not oblige HUD to select them. Here, as there, the statute failed to include a federal managerial role. Here, as there, Congress expressed the aim of giving the lead role to an entity other than the government.
Although we must take as true Plaintiffs’ allegations that HUD in fact required the use of wooden foundations and that those foundations caused injury, the government did not enter into a trust relationship merely because HUD did not approve an alternative design. Although HUD’s power to approve a design implies the power to reject a design as well, the Supreme Court made clear in Mitchell I and Navajo Nation that such oversight authority alone (whether exercised wisely or unwisely) cannot create the legal relationship that is a threshold requirement for Plaintiffs to recover on a trust theory. *928 Even if HUD’s actions in mandating certain construction materials and methods may have been arbitrary or capricious, those actions alone cannot alter the legal relationship between the parties.
In summary, under the Housing Aet, Indian housing authorities (such as the Blackfeet Housing Authority) applied to HUD for loans to enable the housing authority to develop low-income public housing designed to be sold to eligible members of the tribe. Under NAHASDA, block grants could be used by the tribe or its designated housing entity to repair or replace housing. As with any grant of federal funds, certain requirements had to be met to obtain and spend the funds. But the federal government held no property-land, houses, money, or anything else—in trust. The federal government did not exercise direct control over Indian land, houses, or money by means of these funding mechanisms. The federal government did not build, manage, or maintain any of the housing. For these reasons, we adhere to our earlier ruling that the district court properly dismissed Plaintiffs’ claim that HUD violated a trust responsibility. Marceau I, 455 F.3d at 983-85.
C. Administrative Procedure Act
Plaintiffs allege that they are entitled to relief under the APA, 5 U.S.C. §§ 702-706. The APA authorizes suit by “[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute.” 5 U.S.C. § 702. When reviewing an APA claim, a court may only (1) “compel agency action unlawfully withheld or unreasonably delayed”; or (2) “hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” 5 U.S.C. § 706(1)-(2)(A).
In this case, the primary relief sought by Plaintiffs is an injunction ordering HUD to repair (or, where necessary, rebuild) their homes. The district court erred in dismissing Plaintiffs’ APA claim before allowing adequate development of the record. Plaintiffs’ claim rests on two separate legal obligations that give rise to cognizable claims under the APA.
First, as discussed above, the regulations in effect when HUD approved the 153 Blackfeet homes in the late 1970s required that housing materials meet specified Minimum Property Standards. 24 C.F.R. § 805.212 (1979); Indian Housing Handbook §§ 3-19, 3-20. The Minimum Property Standards permitted, but did not require, the use of chemically treated lumber in the foundations of single and double-family dwellings. See 24 C.F.R. § 200.925 & pt. 200, subpt. S, app.; see also Minimum Property Standards Handbook app. E, pp. E-l and E-2. According to the complaint, HUD required Plaintiffs, in violation of its regulations, to use wooden foundations and, further, to use arsenic-treated lumber.
Second, as discussed above, 42 U.S.C. § 1441 imposes binding legal obligations on HUD. Of importance here, HUD is required to “encourage and assist ... the production of housing of sound standards of design, construction, livability, and size for adequate family life.” Id. Plaintiffs allege that, by requiring the use of arsenic-treated lumber, HUD violated 42 U.S.C. § 1441.
At this stage in the litigation, the record is silent about whether HUD failed to comply with its own regulations and whether arsenic-treated lumber was within industry standards at the time. We therefore reverse the dismissal of Plaintiffs’ APA claim and remand to the district court for further factual development.[6]
*929 Under the APA, a plaintiff must seek “relief other than money damages.” 5 U.S.C. § 702. Previously, we held that “the substance of [Plaintiffs’] claim is that they are owed money damages.” Marceau I, 455 F.3d at 985. On rehearing, we now hold that Plaintiffs’ request for an injunction ordering HUD to repair or rebuild their homes is not a suit for “money damages,” as that term is used in § 702.
In Marceau /, we followed the Fifth Circuit’s ruling in Amoco Production Co. v. Hodel, 815 F.2d 352 (5th Cir.1987), and looked to whether an award of money damages could substitute for the requested injunction. See Marceau I, 455 F.3d at 985 (“Here, money damages in an amount necessary to repair or rebuild Plaintiffs’ home[s] would be a sufficient remedy, and, therefore, an injunction is not an available remedy.”). After Amoco, the Supreme Court emphasized that the correct inquiry is whether the plaintiff seeks compensatory relief or instead seeks specific relief; the former constitutes “money damages” but the latter does not. Bowen v. Massachusetts, 487 U.S. 879, 895, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988); see also Dep’t of the Army v. Blue Fox, Inc., 525 U.S. 255, 261, 119 S.Ct. 687, 142 L.Ed.2d 718 (1999) (“Bowen held that Congress employed this language [‘money damages’] to distinguish between specific relief and compensatory, or substitute, relief.”). At least one federal circuit court has recognized that Amoco is no longer good law. Doe v. United Stales, 372 F.3d 1308, 1313-14 (Fed.Cir.2004); see also Nat’l Ass’n of Counties v. Baker, 842 F.2d 369, 373 (D.C.Cir.1988) (rejecting the Amoco rule in a case that predated Bowen).
Plaintiffs seek an injunction, which constitutes specific relief. The injunction sought by Plaintiffs seeks not to compensate, but to “give the plaintiff[s] the very thing to which [they] w[ere] entitled.” Boen, 487 U.S. at 895, 108 S.Ct. 2722 (internal quotation marks omitted). We therefore conclude that this relief is not “money damages” under 5 U.S.C. § 706. See Bowen, 487 U.S. at 893, 108 S.Ct. 2722 (“[I]nsofar as the complaints sought declaratory and injunctive relief, they were certainly not actions for money damages.”); Tucson Airport Auth. v. Gen. Dynamics Corp., 136 F.3d 641, 645 (9th Cir.1998) (“The remedy that [the plaintiff] seeks in its complaint is, at bottom, specific performance of the ... [c]ontract. An action for specific performance is not an action for ‘money damages’ under APA § 702, even if the remedy may actually require a payment of money by the government.”). Consequently, Plaintiffs’ APA claim seeking injunctive relief is not barred.
D. Breach of Contract Claim,s
We readopt our earlier opinion, Marceau I, 455 F.3d at 986, concerning Plaintiffs’ breach of contract claims against HUD. The district court lacked jurisdiction to hear those claims, so there remains nothing for us to review.
AFFIRMED in part; REVERSED in part and REMANDED. The parties shall bear their own costs on appeal.

. Marceau v. Blackfeet Hous. Auth. (Marceau I), 455 F.3d 974 (9th Cir.2006).

. In the district court, Plaintiffs' counsel stated that most of the houses were completed in 1978 and 1979, with “some follow-up into 1980."

. A cognizable claim that rests oil the federal government’s trust obligation is enforceable through the Tucker Act, 28 U.S.C. § 1491, or the Indian Tucker Act, 28 U.S.C. § 1505. United States v. Mitchell, 445 U.S. 535, 538-39, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) *922 (Mitchell I); United States v. Mitchell, 463 U.S. 206, 218, 226, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (Mitchell II). A federal court’s jurisdiction is identical whether conferred by the Tucker Act or the Indian Tucker Act. See Mitchell I, 445 U.S. at 538-39, 100 S.Ct. 1349. As a result, for convenience and unless otherwise noted, we refer to both the Indian Tucker Act and the Tucker Act as "the Tucker Act” in this opinion.

. Variances to the prototype cost limitations were likewise available to non-Indian housing authorities, but under somewhat different rules. 24 C.F.R. § 841.115(2) (1977). However, variances from HUD Minimum Property Standards generally were not available in non-Indian housing programs. See 24 C.F.R. § 841.107(c)(2) (1977) (mandating inclusion of HUD Minimum Property Standards as one of construction standards in design of public housing program projects): 24 C.F.R. § 883.208(a)(2) (1977) (requiring the same for Section 8 projects).

. In 1988, Congress moved the authorization for Indian low-income housing to Title II of the United States Housing Act and formalized the Indian housing program. Indian Housing Act of 1988, 42 U.S.C. §§ 1437aa-1437ee (1988), repealed by Native American Housing Assistance and Self-Determination Act of 1996, Pub.L. No. 104-330, 110 Stat. 4016 (“NAHASDA"). The 1988 statute did not govern at the time the Blackfeet housing was built, nor does it govern presently. For our purposes, the 1988 statute does not affect the analysis.

. Plaintiffs also seek an injunction ordering HUD to respond to their repeated requests for *929 assistance. In Marceau II, 519 F3d at 851-52, we held that HUD was under a legal obligation to respond to those requests. We relied on the obligations found in 24 C.F.R. § 905.270 (1977), and 25 U.S.C. §§4111 and 4132(1). On rehearing, we now hold that HUD had no legal obligation to respond to Plaintiffs' requests, sufficient to give rise to a claim under the APA. Read broadly, those regulations and statutes impose an obligation on HUD to respond to properly formed requests for assistance by housing authorities. They do not require HUD to respond to requests by homeowners such as Plaintiffs, and there is no evidence in the record of a properly formed request for assistance by the Blackfeet Housing Authority.